[S. F. No. 20202.   In Bank.   Oct. 9, 1959.]

In re CLAUDE ALLEN, on Disbarment.

*Assigned by Chairman of Judicial Council.

Wilmont Sweeney, Richard A. Bancroft, Carl B. Metoyer, Clinton W. White and Loren Miller for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—Petitioner, an attorney at law, was charged in Alameda County with four counts of soliciting others to commit perjury (Pen. Code, § 653f). In September, 1957, he changed a plea of not guilty to guilty on counts 3 and 4 and the other two counts were dismissed. Sentence was suspended and he was placed on probation for three years, conditioned in part on the payment of a $2,000 fine within one year.

A record of the conviction (see Bus. & Prof. Code, § 6101) was filed with this court. We issued an order to show cause why a final disciplinary order should not be made and on November 26, 1957, suspended petitioner from the practice

of law pending final disposition of this proceeding. The matter was then referred to The State Bar for report and recommendation as to the extent of discipline to be imposed. (Bus. & Prof. Code, § 6102.) The Board of Governors, by majority vote, followed the local committee's recommendation of disbarment. Three board members dissented on the ground that the discipline recommended was too severe. Petitioner likewise urges that, in the circumstances, disbarment is too harsh a penalty. We conclude that the board's majority recommendation should be accepted.

Petitioner does not dispute that the basic facts warrant disbarment but pleads that consideration be given to his background, which he sets forth as follows: He is a Negro, born in Mississippi in 1916, and presently 43 years of age. In 1935 he graduated from high school in Mississippi, attended two semesters of college, and then quit in order to marry. He was inducted into the Army in January, 1941, and commissioned a second lieutenant. On the termination of hostilities in 1945 he reverted to inactive military status and brought his wife and three children to Oakland, California, where he has since resided. He engaged in various business activities and employments and in 1949 enrolled at Lincoln University Law School in Oakland under the G.I. Bill but continued working outside class hours in order to support his family. He was admitted to The State Bar in 1954, and thereafter, until his present difficulties arose, practiced law independently in the Oakland area. His clientele consisted "almost entirely of and was confined to the Negro population of Alameda County."

In May, 1957, petitioner was representing one Bradley who was plaintiff in an action for damages resulting from an automobile accident that had occurred two years earlier. In the course of preparing the action for trial petitioner retained an investigator named Chapelle and asked him to attempt to locate witnesses to the accident. According to the findings of the local committee and the board, Chapelle and petitioner discussed possible ways to obtain a settlement of the action, including the possibility of obtaining from someone a statement favorable to plaintiff as a basis for negotiating a settlement, and also the possibility of using perjured testimony. Petitioner admits that his conduct during such discussions may have caused Chapelle to feel that perjured testimony would be acceptable. Chapelle offered one Wardell $10 to secure two persons who would testify as witnesses. Wardell got in touch with the district attorney's office, which arranged for two of

its investigators to pose as purported witnesses, and meet Chapelle. Chapelle coached the two as to the testimony they were to give, and on May 17, 1957, took them to petitioner's office where petitioner reviewed such testimony and Chapelle gave each of them $12.50 and promised each a further $12.50 after they had testified. Petitioner did not again see the two witnesses until the day of the trial, June 3, 1957.

On the morning of the trial petitioner in his opening statement declared that he had two witnesses to the accident who would testify. During the noon recess the purported witnesses went to petitioner's office and told him that they had not seen the accident and did not wish to testify. Petitioner insisted that they do so and offered them additional compensation. After trial resumed in the afternoon the two again told petitioner, at the counsel table, that they were not going to testify; petitioner told them to go outside, that he would see them later. During the afternoon recess petitioner went out in the hall to talk with them and was then arrested. Thereafter both he and Chapelle were indicted by the grand jury.

Testimony of the two purported witnesses, given before the grand jury and received in evidence in this disciplinary proceeding, indicates that petitioner knew at the time of the May 17 meeting in his office that such witnesses were false. The only testimony given at the hearing before the local committee was that of petitioner and of character witnesses. Petitioner's counsel stated his testimony would be offered to explain background facts indicating he was not a completely unworthy person, rather than that he had not committed a wrongful act; that it was petitioner's position that after the two purported witnesses "had come into the office, after he had his first interview with them, he was then aware of the fact that they probably were not true witnesses to the accident that did occur; that he did, however, have a client who was [petitioner believed] . . . completely an honest person, but he had no independent witnesses at the time, that he did not send Chapelle, who was his investigator, out to secure perjured testimony, but after it came in and a few days before the trial, he more or less overlooked the fact, or tried to ignore the fact that these people were not true witnesses to the accident."

Petitioner, who testified to the above effect, stated further that when during the noon recess of the trial the witnesses stated that they had not seen the accident and did not want

to testify, he thought perhaps they had talked with an investigator "on the other side" and had been offered more money, and he himself then offered them a bonus if they testified and asked them to "Appear anyway; if you don't testify, appear and we will decide what to do later"; that in the back of his mind was the thought that the presence of witnesses in court, even though they did not testify, might stimulate a settlement. After returning to court in the afternoon petitioner had decided that "I wouldn't put the witnesses on immediately anyway, I would give it more thought and as to whether I would put them on or not, I am not too sure, because . . . I had made an opening statement that I would have these witnesses"; he felt his case was meritorious, as the client's version corresponded to the police report; he was "completely confused" and would have liked to discuss the situation "with the Judge or somebody," but he arrived late in the courtroom and found the judge and jury already in their places. He had previously tried only three personal injury cases. As already related, when during the afternoon the witnesses said they were not going to testify, he told them to go outside and he would see them later, and his arrest followed when he went out to meet them.

Petitioner further declared to the local committee that his conduct had not been ethical or correct, that "I feel that I have done wrong and I have brought discredit upon the Bar Association, and all of you gentlemen here as lawyers . . . and that I should be punished . . . I went to school at night and worked and I was— it was a dog eat dog affair and scuffling for everything." Petitioner also said that his present difficulties had taught him a lesson and "I believe that my ethics and my method of operation will be much more conservative and much better . . . than it has ever been in the past." He declared that in his first conversation with Chapelle he should have made it clear that he was utterly opposed to perjured testimony; that at the time the two purported witnesses came into his office with Chapelle he felt suspicious, and "as captain of the ship" thereafter felt responsible "for the entire operation" and so pleaded guilty to two counts of the indictment.

One of petitioner's character witnesses was a Methodist minister who stated that petitioner "has been highly regarded as quite an outstanding churchman, not only in his local church, but in his denomination. He is one of the leading laymen on the general church level . . . [and] a very fine

family man," that "it is the feeling among" the church people that whatever petitioner "did on this occasion was not in conformity with his usual conduct." The other character witness was an Oakland roofing contractor who stated that for two or three years he and petitioner had owned a bar together, which petitioner managed; that "we were offered money by bookmakers, peddlers of marijuana and that sort of thing . . . to operate in our bar, and Claude [petitioner] turned it down cold"; that petitioner "had every opportunity" to "cheat me out of some money and it wasn't done"; that "We both got out of the bar business because the only way we could have made any money was slightly crooked. I have seen Claude time and time again turn down the chance for a fast buck."

At the time (May, 1958) of the hearing before the local committee petitioner had paid $400 of his fine, had reported regularly to the county probation department, had not obtained regular employment but had had miscellaneous short jobs and was managing to meet a minimum of his obligations, and in the opinion of the probation officer was "making an excellent adjustment considering all the factors involved."

Under the 1955 amendment to section 6102 of the Business and Professions Code this court, following an attorney's conviction of crime, may either disbar or suspend him for a limited time, according to the gravity of the crime and the circumstances of the case.

We have carefully considered petitioner's plea that the penalty of disbarment is for him—because of his background and the circumstances of his prior achievements—too severe a punishment, and that suspension for a period of years would in his case be adequate discipline. We recognize that petitioner has traveled a long way under difficult circumstances in his service to his country, and in his efforts to improve his position in the community, to participate in the activities of his church and to care for his family. But this matter is not merely one of punishment. The trial court in the criminal case handled the matter of punishment and was understandingly lenient; it granted probation. It was dealing with petitioner as a citizen at large. Here, we are dealing with petitioner as a lawyer. We are concerned not with punishment as such but, rather, with administration of The State Bar. Petitioner's responsibilities as a lawyer are different from the responsibilities of a layman. Correspondingly, our duty to the public and to the lawyers of the state in this

respect differs from that of the trial judge in administering criminal law.

For an attorney at law to actively procure or knowingly countenance the commission of perjury is utterly reprehensible. It is far more reprehensible within the profession than when committed by one who is not a lawyer. It marks such person as unworthy of the office of attorney. Above all other professions, members of the Bar should be most scrupulous in their honesty; scrupulous in their own conduct and in that which they should not only advise, but exact, of their employees, their clients and the witnesses they present to the court. It is from this background·of the law as well as in the light of petitioner's background as an individual that we must determine whether this plea for a term of suspension rather than disbarment can properly be granted.

Manifestly the petitioner was not qualified by character to be a member of the Bar at the time of the offenses here involved. Although he urges, as hereinabove noted, that he has now learned a lesson and that ''I believe that my ethics and my method of operation will be much more conservative and much better . . . than it has ever been in the past,'' we believe that the burden properly must rest on him to prove by sustained conduct over a period of years that not only his *belief* as to proper conduct for the future but his character, as well, has been established. His offenses, in our view, are of a nature which inherently call for disbarment. If and when petitioner can reasonably prove by showing a sustained course of conduct that he has attained a standard of character which entitles him properly to be accepted as a member of The State Bar of California, the law and the Rules of Procedure permit an application for reinstatement, upon good cause being shown and in the discretion of the Board of Governors, after a lapse of two years from disbarment. (Bus. & Prof. Code, §§ 6078, 6082; Rules of Procedure of The State Bar, rule 54; see 6 Cal.Jur.2d 178-181, § 45, and cases there cited.)

It is ordered that Claude Allen be disbarred and that his name be stricken from the roll of attorneys of this state, the order to be deemed effective as of and from November 26, 1957, upon which date petitioner was originally suspended from practice on the grounds hereinabove related.