[L.A. No. 29764. In Bank. Oct. 29, 1970.]

SANFORD R. DEMAIN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Sanford R. Demain, in pro. per., and Harry B. Seelig for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the State Bar of California that petitioner be suspended from the practice of law for a period of five years on conditions of probation, including actual suspension for the first six months, restitution within the first two years to one client of $4,097.05 with interest, accounting for all client's funds handled, and compliance with specific conditions relating to a self-confessed alcoholic problem.

Petitioner was born in 1929 and was admitted in December 1957 to practice law in this state. His only prior disciplinary record was suspension for nonpayment of dues from December 19, 1968, to July 10, 1969.

*The Yelm matter.* Petitioner obtained a judgment on August 3, 1967, in favor of his client Miss Shirley Ann Yelm and on August 21 received a draft from the defendant's insurer payable to him and his client in the sum of $6,787.45, for the amount of the judgment and costs. He forged her name, converted the funds to his own use, and despite her frequent demands for her portion ($4,097.05) he failed and refused to make resti-

tution. He admitted that in converting her money he was fully aware that he was using her funds for his own purposes without her consent and that this was dishonest. There was evidence not only that he withdrew the proceeds of this draft from his trust account shortly after it was deposited but that by early October he had overdrawn the account in the sum of $824.49 and had issued NSF checks against it.

*The Wells matter.* On December 8, 1967, petitioner obtained from Deputy City Attorney Jack L. Wells a transcript of the Los Angeles Police Department Board of Rights hearing concerning a client, upon his express promise to return the transcript on or before December 15. He did not return it until May 1969. Meanwhile on March 25, 1968, he knowingly and falsely represented to Mr. Wells that he had given the transcript to his Attorney Service for return to Mr. Wells. It was not until four months after petitioner was served with notice to show cause in this proceeding that he returned the transcript.

Petitioner stated that he could give no plausible reason why he didn't return the transcript sooner other than that he was drinking very heavily at that time and wasn't attending to things he was supposed to be doing.

*The Terrell matter.* Petitioner was retained on September 9, 1966, to represent Mrs. Lita H. Terrell in a divorce action. He filed the complaint on September 22, 1966, in Los Angeles Superior Court but made no attempt to serve the summons and complaint. It was found that apparently no summons had ever been issued. On two separate occasions he represented to Mrs. Terrell that her divorce was set for hearing and requested that she be present with her witnesses at the courthouse. The first time, sometime in the fall of 1967, she arranged to take the day off from work and just as she was about to leave the house petitioner telephoned her that the "hearing" was postponed; the second time, about four months later, she appeared on the date requested but petitioner did not show up. She could not reach him by telephone at his office or home that day and he did not respond to telephone messages left by her. A court clerk checked the file for her and advised that no hearings had been set. She telephoned petitioner's office every day the following week, leaving her name and telephone number, but received no further communication from him. He had quoted her a fee of $275 plus court costs of about $36. His statements for services rendered were paid in full prior to April 15, 1967. He admitted that his appearance in court was not conditional upon his receiving the balance of his fee.

It was found that he knowingly misrepresented to his client the status of her action, failed and refused to communicate with her, failed to offer any excuse for his negligent action and misrepresentations, and failed to

account for and pay over the funds received by him for which no work was performed, thereby converting same to his own use and device.

Petitioner admitted that he just neglected the Terrell matter. In response to the question "With respect to Miss Terrell, I'm not certain that I understand, you contend that you told her to be in court for the time of her hearing because you were in an alcoholic state and didn't know what you were doing?" he replied, "No, that's not my contention. I knew it was wrong." He was then asked "And the decision to tell her to be in court at the time you did when there was no trial set that was done during, if I can refer to it as a lucid moment, was it?" he replied "It would be hard for me to say, sir, whether it was lucid or not. I really couldn't answer."

*The Murray matter.* In April 1966 a Michigan attorney, Mr. Allen J. Murray, referred to petitioner an uncollected Michigan judgment in favor of a Mr. Paul B. Jones for $10,000 against a California resident. Petitioner obtained a credit report on the judgment debtor which he sent to Mr. Murray and on June 20 advised "It appears that the prospects of collection are fairly favorable" stating that if the matter was to be carried further petitioner's fee would be 40% of the recovery with a $100 retainer which would be applied against the proceeds. After receiving the $100 in July 1966 petitioner performed no further services. It was found that he wilfully took no action, filed no proceedings, failed to respond to inquiries from Mr. Murray, failed to advise his client, Mr. Jones, and converted to his own use the $100 fee.

*Evidence in Mitigation.* The charges were primarily proved by petitioner's own admissions. He concedes that the findings and recommendations are supported by the evidence. The only defenses offered by him were that during the times in question he was under great financial stress and was in the throes of a serious drinking problem. Prior to 1966 his financial circumstances were relatively good and although he was a heavy drinker he had his drinking under control. In February 1966 he became a part owner of a cocktail bar located near his office. It proved to be a losing business. He began putting everything he had into its operation, including Miss Yelm's money. He lost it in the summer of 1968 but received no proceeds. His drinking became worse. He developed strange fears. He neglected his law practice. He ignored letters sent to him by the State Bar and he made no effort to communicate with it or to explain his actions. He failed to reply to the notices to show cause until after the hearings were completed. He was cooperative at the hearings, admitted awareness of the wrongfulness of his conduct, and expressed his remorse.

In November 1968 he reached "the bottom," he testified, and then sought help. Prior to that time he had closed his office and attempted to practice

out of his home. About the end of November he entered an alcoholic rehabilitation facility and remained there approximately seven weeks. While there he began attending Alcoholics Anonymous meetings and he had continued to participate in the A.A. program ever since. Declarations[1] of two long-time members of Alcoholics Anonymous allege that essential elements of the A.A. program are an ability to face and accept life's problems and to have an attitude of rigorous honesty. They declare their belief that petitioner is sincerely living up to these principles. In January 1969 petitioner applied to the Alcoholism Council of Greater Los Angeles for help and has since been under the care of a treatment counsellor, Jack Sanow. Mr. Sanow declares that the program is designed to teach an alcoholic to encounter the problems of living without the use of alcohol and that petitioner has developed the proper attitude to make him a successful member of the program. In February 1969 petitioner began psychotherapy sessions with a clinical psychologist, Zena Malek, and has continued in such treatment.

Declarations of two attorneys, Morton A. Kesten and Seymour Zucker, are offered in support of petitioner's qualifications and reputation as an attorney. Mr. Kesten declares that he has known petitioner for over 20 years; that petitioner has always had the respect of his friends, clients and colleagues; that he has referred various legal matters to petitioner since July 1969; that in each case both he and the client were most pleased with the outcome and with petitioner's able manner; and that misappropriation of funds and neglect of professional responsibilities are completely foreign to petitioner's nature and character. Mr. Zucker declares that he has known petitioner for 13 years, that they shared offices from 1959 to 1963 and jointly worked on legal matters and business ventures, that their association was dissolved only because Mr. Zucker accepted a legal position elsewhere, and that he has continued to refer legal matters to petitioner.

■ *Question: Is the degree of discipline recommended appropriate under the circumstances?*

*Yes.* It has been uniformly held that the purpose of a disciplinary proceeding is not to punish the attorney but to inquire into the moral fitness of an officer of the court to continue in that capacity and to afford protection to the public, the courts and the legal profession. (*Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 151 [77 Cal.Rptr. 657, 454 P.2d 329].)
■ Misappropriation of funds entrusted to him, wilfully failing to render services for which he was employed, wilfully failing and refusing to com-

[1]Declarations under penalty of perjury made by several persons on behalf of petitioner have been filed in this review proceeding. This court may consider all matters properly before it even though extrinsic to the record in determining an attorney's fitness to practice. (*Resner* v. *State Bar* (1960) 53 Cal.2d 605, 613 [2 Cal.Rptr. 461, 349 P.2d 67].)

municate with his clients regarding the status of their actions or to answer their communications, falsely and knowingly deceiving other persons are acts sufficient to place in jeopardy petitioner's right to continue the practice of law. ■ Habitual disregard by an attorney of the interests of clients is ground for disbarment, even when such neglect is grossly negligent or careless, rather than willful and dishonest. (*Grove* v. *State Bar* (1967) 66 Cal.2d 680, 683-684 [58 Cal.Rptr. 564, 427 P.2d 164], disbarment.)

■ "Gross carelessness and negligence constitute a violation of the oath of an attorney to discharge faithfully the duties of an attorney to the best of his knowledge and ability and involve moral turpitude, in that they are a breach of the fiduciary relation which binds him to the most conscientious fidelity to his client's interests." (*Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352].) Petitioner's knowledge, ability and experience have not here been questioned. Indeed, they have been highly praised by his colleagues in their declarations herein.

■ Misappropriation of funds entrusted to an attorney at law "is a gross violation of general morality as well as professional ethics, and, in addition, is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment." (*Resner* v. *State Bar, supra,* 53 Cal.2d 605, 612, disbarment.) In the absence of strong mitigating circumstances the usual penalty is disbarment. (See 1 Witkin, Cal. Procedure (1954) p. 91.)

■ Mitigating circumstances may be considered in the determination of discipline to be imposed. (See 1 Witkin, *supra,* Cal. Procedure, 115-118; *idem.,* 1967 Supp. pp. 62-63.) Voluntary closing of a law office during a period of personal difficulty may be considered, and petitioner refers to the closing of his law office during a part of the period in which he was having a drinking problem. It appears that financial difficulties caused him to close his law office and that he practiced out of his home until November 1968 when he went into residential treatment. He can claim no merit for "self-imposed" suspension of practice during the period December 19, 1968, to July 10, 1969, when he was involuntarily suspended for nonpayment of dues.

Neither petitioner's heavy debts nor his drinking problems can exonerate his acts of forgery, misappropriation, deception and misrepresentation. ■ Whatever the reason for an attorney's misconduct, our concern is and must be the protection of the public in the high duties of an attorney, the preservation of public confidence in the legal profession, and the maintenance of the highest professional standards for attorneys.

 The trial committee, before whom petitioner personally appeared, and the Disciplinary Board have indicated by their recommendations their belief that petitioner can redeem himself if permitted to resume practice after a short actual suspension but subject to specific conditions of probation extending over a five-year period. We specifically note petitioner's prior good record as a lawyer, the confidence presently placed in him by his fellow attorneys, and the diligence and dedication with which he has applied himself as a lawyer since his return to practice. We note his candor, cooperation and remorse throughout the disciplinary proceedings, and the efforts he has made and is making to overcome his personal difficulties and to repay his debts. We therefore concur in the recommendations as made.

It is ordered that petitioner be suspended from the practice of law for a period of five years, that execution of the order for such suspension be stayed, and that petitioner be placed upon probation for said period of five years upon the conditions prescribed by the board in this matter, including actual suspension from practice for the first six months thereof, the order to be effective 30 days after the filing of this opinion.