[No. S005191. Jan. 5, 1989.]

In re PAUL I. MOSTMAN on Suspension.

726

COUNSEL

Howard L. Weitzman and Wyman, Bautzer, Christensen, Kuchel & Silbert for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

OPINION

THE COURT.—The Review Department of the State Bar Court has recommended that petitioner Paul I. Mostman be suspended from the practice of law following his plea of guilty to the charge that he sought to have a former client assaulted and seriously injured. The review department found that the circumstances of the offense demonstrated moral turpitude and recommended that petitioner serve an actual suspension of eighteen months as one condition of probation from a five-year period of suspension. Petitioner urges us to adopt the more lenient approach of the hearing panel, which found that his crime did not involve moral turpitude and recommended no actual suspension. We conclude that actual suspension is warranted, but we find the review department's recommendation of 18 months inadequate and, in accordance with the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V), increase the period of actual suspension to two years. With that modification, we adopt the recommendation of the review department.

## FACTS

Petitioner was admitted to the bar on January 7, 1962, and was a general practitioner in Los Angeles when the events underlying the present matter occurred. Petitioner was arrested on November 24, 1982, and was charged in a two-count information with solicitation to commit assault by means of force likely to produce great bodily injury (Pen. Code, § 653f, subd. (a)) and solicitation to commit murder (Pen. Code, § 653f, subd. (b)). On November 4, 1983, he pled guilty to the first charged offense and was sentenced to two years in state prison.

The charges against petitioner stemmed from his acquaintance with one John Roper, alleged by petitioner to be a self-professed "hit-man" related to an organized crime figure. Petitioner initially met Roper in the late 1970's, when Roper sought advice about a personal injury case involving his wife then being handled by another attorney. After petitioner declined to take the case and advised Roper that the other attorney was handling the matter properly, the two men became friends and occasionally met for lunch and dinner. Between 1979 and 1981, petitioner also handled one personal injury case and a pair of disputes with neighbors for Roper. Early in the relationship, Roper stated that he was the nephew of a man reputed to be the leader of an organized crime family and had performed killings for him. Petitioner did not fully believe these statements, but "someone else" subsequently confirmed the identity of Roper's uncle.

In late 1981, tension began to develop between the two men as a result of two incidents. First, Roper brought two friends to petitioner for legal advice about an auto accident. During the initial interview, petitioner decided not to take the case because Roper insisted upon answering all of the questions. When Roper's friends insisted that petitioner had to take the case because he was Roper's "partner," petitioner explained that Roper was only a non-lawyer friend. Roper was evidently angry at being contradicted in his friends' presence, and petitioner had to warn him against making any such arrangements or statements in the future.

Soon after this incident, Roper asked petitioner to prepare a notice of lis pendens in one of his disputes with a neighbor. Petitioner declined. Roper, apparently assisted by petitioner's secretary at the time, then had the document prepared on petitioner's letterhead and recorded it without petitioner's consent. When petitioner discovered this action, he told Roper he wanted him to sign a release of the lis pendens. Roper refused, and the two men had a "disagreement" over the matter, Roper telling petitioner he would let him know the following Monday whether he would do as petitioner requested.

That weekend, files pertaining to Roper and his two friends were taken from petitioner's office without his permission. Petitioner later learned that the files had been given by Roper to another attorney, who called petitioner to ask him to sign a substitution of attorneys form. Petitioner advised the attorney of the circumstances under which the files had been removed from his office and agreed to sign the form after the attorney promised that Roper would deliver the files to petitioner for copying.

When the two men met for this purpose, petitioner accused Roper of burglarizing the office. Petitioner also asked about the files, which Roper had not brought with him, but Roper told petitioner to "sign the substitutions and like it." Petitioner responded that he was tempted to file a complaint with the police, to which Roper replied that if the police were called, petitioner might "find [his] little girl hanging from a tree." That was the end of the conversation, and petitioner had no further direct contact with Roper.

Three months later in January 1982, petitioner changed office locations. Within a few days of moving into his new building, a "condominium type building," he discovered that Roper was working in an office on the floor above him in the same building. Over the course of that year, several unusual events involving petitioner took place. Petitioner, for reasons never made clear, believed Roper was responsible in some fashion for each incident. As the events are critical to our review of petitioner's conduct, we address them in some detail and note the chronology.

February 1982: Tom Finney, a former client of petitioner's, told petitioner that he had been paid by Roper to file a complaint against petitioner with the State Bar. Although Finney withdrew the complaint, he said he thought petitioner should know Roper was "after" him.

February — March 1982: Sean Donnelly, a former client of petitioner's, came to see him in February to complain that Roper was bothering Donnelly's mother by insisting he was owed a fee for the case involving Donnelly that Roper had referred to petitioner. Donnelly was very upset with Roper and said he "wanted to fix [Roper's] wagon." Petitioner refused involvement in such an endeavor. Donnelly called again the next month, asking to borrow some money so he could hire someone to help him beat up Roper. Petitioner turned him down.

March 1982: The city building department received an anonymous tip that a retaining wall around petitioner's house did not comply with local regulations and eventually ordered petitioner to rebuild the wall. The contractor who built the wall had been recommended to petitioner by Roper, and he apparently had told only Roper that the wall was not "up to code."

April — June 1982: Donnelly came to see petitioner again, bringing with him an acquaintance who had been in an automobile accident and wanted a lawyer. In a private conference held at Donnelly's request, Donnelly again expressed his anger at Roper and indicated he wanted to "off" him. Petitioner understood Donnelly to mean he wanted to kill Roper and again refused involvement.

June — July 1982: Various cars petitioner parked in his assigned space in the office building's secured garage were vandalized. The initial incidents appear to have resulted mainly in minor damage. The paint on petitioner's Italia, an expensive and rare sports car he had recently had restored, was scraped all around the car with a sharp object. While the Italia was being fixed, petitioner drove his mother's Chevrolet to work. The first day he did so, he returned to the car after work to find that its radio antenna had been broken in half. Soon after this incident, petitioner drove his family's Mazda to work. It, too, had its radio antenna broken in half. Petitioner next drove his open-top Ferrari to work. When he returned to the car, he found that feces had been thrown on the front seat. The next day, the hood of the Ferrari was dented by what appeared to be the heel marks from someone pounding on the car with a shoe. The next three incidents were potentially more serious. First, as petitioner was leaving to drive home in his newly repaired Italia, his associate yelled at him to stop and the two men discovered that four of the five lug nuts on each of the car's rear wheels had been removed and fifth lug nut on each wheel loosened—such that the wheels would probably have come off when petitioner reached freeway speeds, if not sooner. Second, the Italia was damaged again by having sugar poured in its gas tank—such that the engine quit and the car stalled while petitioner was on the freeway. This car, which had a unique and readily identifiable license plate, was then further damaged—in fact, stripped of all removable parts—while it was parked at a garage waiting to be repaired. Finally, as petitioner entered the freeway one evening, again driving his Ferrari while the Italia was being repaired, one of the left rear tires suddenly deflated. The cause proved to be a puncture from an ice pick or similar sharp instrument.

July — August 1982: Petitioner and his wife went away for a weekend, leaving her brother at their house to take care of the pets. Late that Saturday night, someone wound a two-inch wide red ribbon through the fencing all around the house.

September 1982: Petitioner was rear-ended by a pickup truck while driving home one night from his bridge club, where Roper knew petitioner played. Petitioner stated that the truck "smashed into the back of me, very hard and took off." It did not have its headlights lit, nor did it have a visible license plate. Petitioner suffered an injured knee in the hit-and-run accident and was off work for three to six weeks.

September — October 1982: Petitioner discovered that Roper's wife had written a letter to the State Bar falsely accusing him of making sexual advances to her in his office.

Petitioner believed that Roper was responsible for all of the foregoing incidents. Over the course of the year, petitioner had become "afraid of what [Roper] might do." Petitioner stated that Roper knew that in 1974 petitioner had undergone a serious laminectomy and been told he would never walk without a cane, and that although he had regained almost normal movement, he had a fear of being crippled. At some point, he had steel roller shades similar to those that protect jewelry stores at night installed on three large windows of the house so that at night the windows would be secure. And he installed a steel bolt on the house's double doors to prevent intruders from kicking in the doors.

When petitioner saw Mrs. Roper's letter, he was enraged. In his own words, "[i]t was so ridiculous and so insulting that I shuddered. I was so angry that I just wanted to strike out, and I was mad, and I—I don't know. I can't describe it. I was no longer myself."

Petitioner called Donnelly, who had over the preceding months called petitioner about once a month repeating his desire to do something to Roper. Petitioner called Donnelly for the admitted purpose of soliciting Donnelly's aid in physically harming Roper. To this end, the two men had several conversations beginning in October and lasting until late November 1982. Unbeknownst to petitioner, however, Donnelly at some point became an informant for the police, who recorded some of the conversations between the two men.

The first few conversations occurred over the telephone and were not recorded. Petitioner testified that he initiated the first of these unrecorded conversations and that Donnelly called back one or two times to clarify matters. Petitioner essentially asked Donnelly how much it would cost to hurt Roper badly enough to make him leave petitioner alone. Donnelly countered by offering to kill Roper for $5,000, suggesting that Roper would kill anybody who tried to harm him. When petitioner responded that he was only interested in inflicting injury, Donnelly speculated that it would cost $1,000 to hire someone for that purpose.

Several of the later conversations were tape-recorded.[1] The transcripts reveal that the first few recorded conversations were initiated by phone calls

---

[1] The transcripts of these conversations, dated November 19, 22, 23, and 24, 1982, were admitted into evidence by the hearing panel and are included in the record before this court. The record further indicates that the panel also admitted the actual audio cassette into evidence and listened to it in its entirety. The parties later stipulated to the withdrawal of that tape from the record and agreed that the transcripts accurately reflected the conversations.

from Donnelly at a police station to petitioner at his office. They indicate that petitioner had become increasingly concerned over the practical details of the crime as the planning period wore on. Specifically, on November 19, petitioner asked Donnelly whether he was "getting cold feet." Petitioner stated that he had no "compunction against doing it" himself, except for the "repercussions." He twice indicated that he was worried that Roper might "retaliate" if simply injured.

In a November 22 phone conversation, Donnelly said that the plan was in place, but that his partner needed an advance payment. Petitioner agreed to make a downpayment, but expressed concern that Donnelly was not handling the matter himself. When Donnelly explained that it would take two men to do the "driving and picking up," petitioner agreed to the plan and told Donnelly he could stop by the next day and pick up the money. When Donnelly called back the following day to advise petitioner that Roper was out of town, petitioner indicated he wanted to talk with Donnelly in person to discuss the matter, not over the phone, and suggested that he was thinking about only having Roper hurt.

The final conversation occurred in person at petitioner's office on November 24 and was recorded. Petitioner opened the conversation by directing Donnelly to "hurt him bad" but later in the conversation changed his mind and returned to the desire to have Roper killed. The reason for this change of heart is not clear, but may have had its genesis in petitioner's concern that Roper would recognize his assailants and trace them back to petitioner. Early in the conversation, petitioner said to Donnelly, "I take it your partner is going to do it because he'll recognize you, right." But Donnelly indicated that he intended to participate in the assault, and it was a short while later that petitioner said, "I'd rather off him, you know." And he repeated this desire, saying, "You know, I'd rather off him if—if you were going to do it."

Donnelly agreed. Petitioner then wrote a check as a downpayment. Donnelly offered to bring some personal item belonging to Roper, such as a wallet or ring, as "proof that it's done." Petitioner said "[t]hat would be fine." Petitioner then asked, "Are you going to do it so that they don't find the body?" While he offered Donnelly no advice in this regard, petitioner opined that "[i]t's probably better if it isn't found." Petitioner was arrested that afternoon.

While petitioner's appeal (claiming sentencing error) was pending, we referred this matter to the State Bar for a report and recommendation on whether the facts and circumstances surrounding petitioner's conviction involved moral turpitude or other conduct warranting discipline. After

petitioner's conviction became final, a two-day evidentiary hearing was held.

Petitioner testified to the foregoing events at the disciplinary hearing, and acknowledged that his conduct was inexcusable and wrong. He admitted he had intended to cause Roper bodily injury but could not recall forming an intent to kill. He opined that his behavior was a bizarre response to various pressures bearing down on him simultaneously.[2] However, petitioner felt that prison and psychotherapy had given him a "positive outlook" on life, teaching him to talk openly with others before allowing stress to build up. He started practicing law again in September 1984 after being released from prison, and he has consistently told prospective clients about his conviction.

Psychiatric testimony presented at the hearing substantiated petitioner's view that the crime was an alien episode in petitioner's life. A psychiatrist who treated petitioner in 1985 and 1986 testified that several deep-seated personality disorders had caused him to overreact to fear and responsibility, but that petitioner was now better able to handle stress and that a repeat of his criminal behavior was unlikely if he continued in therapy. This prognosis was shared by a licensed clinical social worker who had treated petitioner in 1984 and 1985.

Petitioner also presented the testimony of several friends, clients, former clients, attorneys, and one superior court judge. They generally gave favorable testimony concerning his personal character and professional competence. Some of the witnesses testified as to petitioner's concerns around 1982 with problems he attributed to Roper, as to his expressions of fear of Roper and as to his anger and desire for revenge. Some testified in addition that petitioner had demonstrably matured since being released from prison and that they believed he was currently capable of competently practicing law.

The hearing panel found that petitioner's offense did not involve moral turpitude because petitioner acted under "duress" as defined in *Montag* v. *State Bar* (1982) 32 Cal.3d 721 [186 Cal.Rptr. 894, 652 P.2d 1370]. The panel also identified a number of mitigating factors, including petitioner's emotional distress at the time, and his subsequent remorse, candor and cooperation. The hearing panel also noted that petitioner's conduct did not arise out of the attorney-client relationship and found that petitioner had

---

[2] In retrospect, petitioner believes that a conspiracy between Roper and Donnelly led to his arrest, and it appears to be the case that the campaign of harassing incidents to which he had been subjected ceased immediately upon his first call to Donnelly. Indeed, petitioner testified at the hearing that Donnelly "admitted" at the preliminary hearing on the criminal charges against petitioner that he went to Roper after petitioner called him in October 1982 and that the two men went together to the police.

reason to believe that he and his family were in physical jeopardy caused by Roper. Finally, the panel made a finding that "[i]n 25 years of practice, [respondent] has never been disciplined." The hearing panel recommended that petitioner be suspended for three years, that execution of the suspension order be stayed, and that petitioner be placed on probation, with no period of actual suspension. The State Bar examiner sought review of this decision.

The review department by a 10-to-3 vote adopted findings largely similar to those made by the hearing panel, although, unlike the panel, it concluded that the offense did involve moral turpitude. As to mitigation, the review department did not find, as had the hearing panel, that petitioner had reason to believe he and his family were in physical danger from Roper, but otherwise found as follows: "(a) [Petitioner] had practiced law without blemish for 20 years before this matter arose. [¶] (b) When solicited by Roper to participate in the prosecution of questionable cases, [petitioner] refused to do so. [¶] (c) The conduct leading to [petitioner's] conviction did not directly involve the practice of law. [¶] (d) [Petitioner] was under great emotional distress in his personal life at the time of Roper's threats and the vandalism to [petitioner's] property and [petitioner] truly believed that Roper was behind the various incidents. [¶] (e) The discussions with Donnelly respecting physical injury to Roper were initiated by Donnelly, who was a police informant during all or part of the time the discussions were ongoing. The evidence suggests that Roper and Donnelly acted together to compromise [petitioner]. [¶] (f) [Petitioner] has credibly shown remorse and sorrow concerning his actions, and has accepted responsibility for them. He has been forthcoming and candid with prospective clients, friends, and colleagues concerning his conviction and imprisonment. [¶] (g) [Petitioner] has been cooperative with the State Bar and has sought psychiatric help, which his physician indicates is no longer needed."

As to aggravation, the review department added three factors: "(a) [Petitioner] failed to follow the advice given by the police department when his property was being vandalized [i.e., to hire a private investigator], even though, given his experience, he should have had access to investigators who might have discovered the perpetrators. [¶] (b) [Petitioner] continued his discussions with Donnelly over a period of more than six weeks, longer than is reasonable under the 'heat of anger,' and after the incidents he attributed to Roper had ceased . . . . He gave Donnelly money which Donnelly was to use in hiring someone to kill Roper. [¶] (c) The recorded conversations between [petitioner] and Donnelly indicate [petitioner's] belief that Roper was afraid of him . . . and a disbelief that Roper had a connection with the mafia . . . ."

By a 9-to-4 vote, the review department expressly rejected the hearing panel's disciplinary recommendation. Noting that petitioner continued to

scheme with Donnelly for more than six weeks after the last incident of alleged provocation and that he intended at least to inflict great bodily harm on Roper, it concluded that petitioner had not established duress or provocation sufficient to negate the finding of moral turpitude. The review department thus determined that a longer period of suspension and probation, and a period of actual suspension, was required. It recommended that petitioner be suspended for five years, that execution of the suspension order be stayed, and that he be actually suspended for eighteen months as one of the conditions of probation.[3]

Petitioner contends here, as he did before the review department, that his conduct did *not* involve moral turpitude and that, even if we conclude to the contrary, the overwhelming evidence of mitigation should lead us to adopt the hearing panel's recommendation of no actual suspension. We cannot agree.

### DISCUSSION

#### 1. *Did Petitioner's Crime Involve Moral Turpitude?*

A final judgment convicting an attorney of a crime involving moral turpitude is cause for the attorney's suspension or disbarment. (Bus. & Prof. Code, §§ 6101, subd. (a), 6102, subd. (d).) Petitioner's plea of guilty is conclusive evidence that he committed all acts necessary to constitute the offense. (Bus. & Prof. Code, § 6101, subds. (a) & (e); *In re Ford* (1988) 44 Cal.3d 810, 815 [244 Cal.Rptr. 476, 749 P.2d 1331].) ■ It does not, however, answer the question whether his crime, or the circumstances of its commission, involved moral turpitude. That question is one of law to be resolved by this court upon an independent examination of the record. (*In re Calaway* (1977) 20 Cal.3d 165, 169 [141 Cal.Rptr. 805, 570 P.2d 1223].)

■ Although the concept of moral turpitude defies exact description, its purpose is clear. It enables us to identify those attorneys who are unfit to practice law, so that discipline can be imposed to protect the public, bench and bar from future misconduct. (*In re Higbie* (1972) 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97]; see also *In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244]; *Wong* v. *State Bar* (1975) 15 Cal.3d 528, 531-532 [125 Cal.Rptr. 482, 542 P.2d 642].) One eloquent, oft-cited definition equates moral turpitude with an "act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule

---

[3] Three of the referees who dissented from this portion of the decision recommended disbarment. In a strongly worded dissent, they characterized petitioner as the knowing instigator of a conspiracy to commit murder who had presented a sophisticated and artificial duress defense. The basis for the fourth dissent from the recommended discipline is not indicated.

of right and duty between man and man." (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; see also *In re Strick* (1983) 34 Cal.3d 891, 901-902 [196 Cal.Rptr. 509, 671 P.2d 1251]; *In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465].)

■ Conviction of some crimes establishes moral turpitude per se. These crimes have been characterized as universally morally reprehensible, such as first degree murder. (*In re Kirschke* (1976) 16 Cal.3d 902, 904 [129 Cal.Rptr. 780, 549 P.2d 548].) Or they are crimes which necessarily involve an intent to defraud or to engage in dishonest acts for personal gain, such as perjury (*In re Kristovich* (1976) 18 Cal.3d 468, 472 [134 Cal.Rptr. 409, 556 P.2d 771]), grand theft (*In re Basinger* (1988) 45 Cal.3d 1348, 1358 [249 Cal.Rptr. 110, 756 P.2d 833]), and embezzlement (*In re Ford, supra,* 44 Cal.3d at p. 813).

Other crimes, however, do not, standing alone, necessarily involve such dishonesty or deep-seated moral degradation. We have, for example, viewed voluntary manslaughter as a crime which does not necessarily involve moral turpitude. (*In re Strick* (1987) 43 Cal.3d 644, 653 [238 Cal.Rptr. 397, 738 P.2d 743]; see also *In re Nevill* (1985) 39 Cal.3d 729, 733-734 [217 Cal.Rptr. 841, 704 P.2d 1332].) We have said that commission of "lesser infractions of the penal laws," such as simple assault, "in the heat of anger or as the result of physical or mental infirmities does not, without more, cast discredit upon the prestige of the legal profession or interfere with the efficient administration of the law. . . ." (*In re Rothrock* (1940) 16 Cal.2d 449, 459 [106 P.2d 907 [131 A.L.R. 226].) In such instances, we examine the facts behind the record of conviction to determine whether the attorney is professionally unfit.

■ We have not previously decided whether criminal solicitation constitutes moral turpitude per se or whether a factual inquiry into the circumstances of the offense is required. In prior cases, we have on occasion summarily concluded that the crime of solicitation involved moral turpitude, but in each instance that conclusion may have flowed from the underlying offense the attorney solicited rather than the solicitation itself. (See, e.g., *In re Bloom* (1977) 19 Cal.3d 175 [137 Cal.Rptr. 168, 561 P.2d 258]; *In re Weber* (1976) 16 Cal.3d 578 [128 Cal.Rptr. 434, 546 P.2d 1378]; *In re Allen* (1959) 52 Cal.2d 762 [344 P.2d 609]; cf. *In re McAllister* (1939) 14 Cal.2d 602, 603 [95 P.2d 932] ["If the actual commission of an offense involves moral turpitude, then a conspiracy to commit such offense would involve moral turpitude."].)

We decline to adopt an inflexible rule on the proper characterization of criminal solicitation. In one sense, the act of soliciting another person to commit an offense may demonstrate moral turpitude rendering an attorney

unfit to practice law regardless of the nature of the underlying offense. But it is also possible to conceive of situations in which an attorney convicted of soliciting an offense that itself involved moral turpitude might not be culpable under our commonsense disciplinary standard. (Cf. *In re Arnoff* (1978) 22 Cal.3d 740, 746 [150 Cal.Rptr. 479, 586 P.2d 960] [discipline may not necessarily be appropriate for "commission of an act or acts beyond [the] control of an attorney."].) Adopting the most flexible approach to the moral turpitude question here, we assume that inquiry into the circumstances underlying petitioner's conviction is appropriate.

■ Petitioner accepts the review department's factual findings, but claims that certain ameliorating circumstances were overlooked in its consideration of the moral turpitude question. These include his belief that Roper was engaged in a campaign of terror against him, that Roper was a contract killer capable of committing serious bodily harm, and that he was compelled to take drastic measures to protect himself and his family. It is also pertinent, contends petitioner, that Donnelly was a police informant who was acting in concert with Roper and that Roper may never actually have been in danger.

Our independent review of the record reveals that petitioner's contention he acted out of an actual belief or fear that he or his family were in imminent physical danger is not substantiated sufficiently to cause us to disagree with the review department on the question of moral turpitude. While it is clear that petitioner genuinely believed that Roper was responsible for all of the harassments, the evidence establishes that the crime was primarily induced by petitioner's loathing for Roper and his desire to end the problem in an avenging manner.

We begin by noting that the only face-to-face confrontation between the two men is the death threat against petitioner's daughter. Even though the statement was undoubtedly frightening, it was made in October 1981, a full year before petitioner began soliciting Donnelly's aid in hurting Roper. No action was taken by Roper indicating that he intended to act on this particular threat, and no further verbal threats of any kind are identified by petitioner in the record. Petitioner did not report this incident to the police, nor did he take any other steps indicating that he thought his daughter was actually in imminent danger. This calm reaction, coupled with the sheer passage of time, refutes any provocation claim arising out of this particular incident.[4]

---

[4] Petitioner relies heavily upon the facts in *Montag* v. *State Bar, supra,* 32 Cal.3d 721, to excuse his conduct. But the case is inapposite. In *Montag,* an attorney, kidnapped at gunpoint and held captive for several hours, eventually cashed several checks for the two men and later solicited one of them to kill the other after he was told the intended victim of his solicitation was a "psychopath" who would probably return to kill him. Still later, the attorney gave false

Another significant action attributed to Roper is the removal of lug nuts from one of petitioner's cars. Unlike most of the other incidents involving petitioner's cars, this act suggests that its perpetrator intended harm to befall the driver. Indeed, petitioner testified that Roper probably intended for the wheels to fall off in traffic. Yet once again, petitioner did not respond with alarm. He informed the police about the string of damaging acts to his cars, but apparently did not place special emphasis on the lug nut incident. Rather, as suggested by his testimony, he perceived it as simply another act of vandalism. Petitioner does not attempt to explain why he waited so long to take preventive measures if he actually believed his life was in danger throughout that time.

The same analysis applies to the hit-and-run auto accident. A period of approximately one month separated this event and the start of petitioner's criminal solicitation. Again, petitioner did not respond by taking steps to protect his safety. Moreover, he freely admitted before the hearing panel that it was Mrs. Roper's complaint to the State Bar later that month, not the collision, which prompted him to call Donnelly.

There is no further support in the record for petitioner's claim that he feared for the safety of himself or his family. The only other acts attributed to Roper are the two State Bar complaints, the anonymous tip to city building code authorities, the incident of the red ribbon woven into the fence around the family home, and assorted acts of damage to the cars. These events may have been upsetting, but they clearly do not justify serious physical retaliation.[5]

In sum, we concur with the review department's conclusion that there is no provocation excusing or lessening the culpability of petitioner's actions for disciplinary purposes. The evidence shows that he had grown to despise Roper and wished to end the harassments in a way that smacked of revenge. This motivation led him to engage in criminal conduct which extended over a number of weeks. During that time, he never wavered in a *minimum* commitment to cause Roper serious bodily injury. And, as the time for action drew near, that commitment was transformed into a full-blown

testimony before a grand jury that the two men had extorted money from him on several occasions. We found excusable the solicitation because it was performed under duress, but we found that the attorney's false grand jury testimony constituted misconduct because he was not under duress at the time. Petitioner's actions are plainly more in line with that second aspect of the *Montag* decision.

[5] Nor can much weight be accorded to Roper's purported connections to organized crime. Petitioner vaguely testified at the hearing that someone, at some unspecified point in time, confirmed that Roper was the nephew of a man purported to be the leader of an organized crime family, but the tape-recorded conversations suggest that petitioner did not believe these rumors and that he may not have thought Roper was himself dangerous.

intent to have the victim killed.[6] This disregard for human life is coupled with petitioner's willingness to implicate two other people—Donnelly and his alleged "partner"—in his scheme. The foregoing acts attest to a knowing and flagrant disregard for the law and for the welfare of others (*In re Alkow* (1966) 64 Cal.2d 838, 841 [51 Cal.Rptr. 912, 415 P.2d 800, 21 A.L.R.3d 882]), and therefore evince moral turpitude.

### 2. *What is the Appropriate Degree of Discipline?*

 Having determined that petitioner's offense involved moral turpitude and that discipline must be imposed, we are left with the task of determining the appropriate degree of that discipline. It is well settled that where a disparity exists between the recommendation of the hearing panel and the review department, that of the review department is entitled to greater weight. (*Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 693-694 [238 Cal.Rptr. 774, 739 P.2d 134].) And, even though we accord great weight to the department's recommendation, the "ultimate disciplinary decision rests exclusively with this court." (*Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1099 [245 Cal.Rptr. 628, 751 P.2d 894].) No fixed formula guides our determination. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 14 [206 Cal.Rptr. 373, 686 P.2d 1177].) We examine the aggravating and mitigating circumstances presented by the particular case (*Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 133 [207 Cal.Rptr. 302, 688 P.2d 911]), as well as the nature of the offense itself. And we have not hesitated to impose a harsher sanction where the proposed discipline is inadequate to prevent the probable recurrence of misconduct. (*Carter* v. *State Bar, supra,* 44 Cal.3d at p. 1101; see also *In re Nevill, supra,* 39 Cal.3d at p. 735; *Martin* v. *State Bar* (1978) 20 Cal.3d 717, 723 [144 Cal.Rptr. 214, 575 P.2d 757].)

The Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V [hereafter standards]), effective January 1, 1986, suggest that the discipline recommended by the review department is inadequate. Standard 3.2 states: "Final conviction of a member of a crime which involves moral turpitude, either inherently or in the facts and circumstances surrounding the crime's commission shall result in disbarment. Only if the most compelling mitigating circumstances clearly predominate, shall disbarment not be imposed. In those latter cases, the discipline shall not be less than a two-year actual suspension, prospective to any interim suspension imposed, irrespective of mitigating circumstances." We

---

[6] Little weight can be attached to the fact that no harm actually befell Roper, or that he may have been cooperating with Donnelly and the police. Even if true, these factors do not bear on petitioner's state of mind. His ultimate intent was to have Roper killed, and he paid money to guarantee that result. Petitioner conceded at the hearing that Donnelly's role as a police informant was a mere "fortuity" which prevented any physical harm from occurring.

conclude that here the mitigating circumstances indeed predominate, but we see no reason to depart from the minimum discipline specified.

We begin by noting that one of the mitigating factors cited by the review department is not supported by the record; specifically, its finding that petitioner "had practiced law without blemish for 20 years before this matter arose." In fact, petitioner had passed through the disciplinary process on two prior occasions. In 1973, he was privately reproved for negligently permitting a nonlawyer employee to hold himself out as an attorney and for commingling client funds with his own, both matters dating from 1969. In 1976, he was again privately reproved for failing to act competently and with reasonable diligence in one client matter and for failing to maintain that same client's confidences in a separate matter, both dating from 1970.

We are at a loss to explain the review department's error. Although petitioner may have initiated the confusion by stating in his posttrial brief to the hearing panel that he had "no prior record of discipline over more than twenty years of practice," the record of the two private reprovals was filed as an exhibit on June 25, 1987—almost four months before the review department issued its decision. It is perhaps conceivable that both petitioner and the review department mistakenly considered his private reprovals to be more in the nature of admonitions not constituting "imposition of discipline upon the member." (Rules Proc. of State Bar, rule 415.) If such was the case, they were wrong. (See *Garlow* v. *State Bar* (1988) 44 Cal.3d 689, 710 [244 Cal.Rptr. 452, 749 P.2d 1307].) But although petitioner's prior disciplinary record should therefore have been considered as a factor in aggravation, rather than one mitigating his conduct, the age and relative nonserious nature of the prior misconduct makes it a less significant factor here. (See *McCray* v. *State Bar* (1985) 38 Cal.3d 257, 274 [211 Cal.Rptr. 691, 696 P.2d 83].)

In all other respects, the record amply supports the review department's findings by way of mitigation. Before his break with Roper, petitioner on more than one occasion declined to participate in questionable conduct, thus evidencing good faith and the ability to adhere to the standard of conduct expected of a member of the bar. (See std. 1.2(e)(ii).) Although petitioner's conduct ultimately involved the solicitation of one former client to assault another, it did not directly involve the practice of law in any way (cf. Bus. & Prof. Code, § 6102, subd. (c)(2)) but was instead a personal reaction to what petitioner believed was a course of threatening conduct directed at him personally. And the idea of injuring Roper was initially raised by Donnelly, who persisted in keeping the idea before petitioner throughout the months that petitioner was being subjected to harassing and threatening incidents. (Cf. *In re Higbie, supra,* 6 Cal.3d at pp. 573-574.)

While this does not excuse petitioner's willingness to take advantage of the opportunity thus presented, we cannot ignore the strong suggestion in the record that Roper and Donnelly acted together to compromise petitioner—and that they succeeded.

Moreover, petitioner was under great emotional distress in his personal life at the time the various events took place. We think there is in fact more in the record than is apparent from the review department's findings. Petitioner had lost both of his sisters to cancer a number of years before, and his father had died in 1971. In the midst of the events described previously, his mother suffered a stroke and, after being hospitalized, was discovered to have Alzheimer's disease. At the same time, petitioner was involved in a custody dispute with his former wife and felt he was losing his son from that marriage. And, as noted previously, petitioner himself evidently had serious fears of being permanently injured. In light of this history, we find it easier to understand how petitioner reacted unreasonably to what he perceived as a campaign to harm himself and his family—although, as we have noted, it does not persuade us that his crime itself did not involve moral turpitude.[7] That stress is present as a mitigating factor here is clear, and we are reassured by the testimony of petitioner and those who treated him that he has become better equipped to deal with such emotional pressures. (See std. 1.2(e)(iv).)

We also agree with the review department that petitioner has credibly shown remorse and sorrow concerning his actions, that he has accepted responsibility for them and that he has taken steps, including psychiatric treatment, to ensure that he is better able to deal with any similar problems in the future. (Std. 1.2(e)(vii).) By pleading guilty and foregoing a tenable defense of entrapment to the criminal charges, he indicated recognition of his wrongdoing and a desire to rehabilitate himself. (*In re Higbie, supra,* 6 Cal.3d at p. 574.) He has been forthcoming and candid with prospective clients, friends and colleagues concerning his conviction and imprisonment. (Std. 1.2(e)(v).) He enjoys a good reputation among his clients and with members of the community, even among those persons apprised of the extent of his wrongs. (Std. 1.2(e)(vi).) And his cooperation with the State Bar throughout the disciplinary proceedings is worthy of consideration.

---

[7] In this regard, we are less inclined than was the review department generally, and its dissenting members in particular, to characterize as aggravating the fact that petitioner continued his discussions with Donnelly after the harassing and threatening incidents had ceased. We think its narrow view of the time frame within which petitioner should have, in essence, come to his senses, overlooks the cumulative impact of multiple stresses spread over many months. We also think the members of the review department may have erred in concluding that petitioner was not in fact afraid of Roper, for that conclusion appears to be based almost entirely on a single passage from one of the early conversations between Donnelly and petitioner, a passage that can as easily be interpreted as posturing on petitioner's part as it can be read to indicate a lack of fear of Roper.

(*Demain* v. *State Bar* (1970) 3 Cal.3d 381, 388 [90 Cal.Rptr. 420, 475 P.2d 652]; std. 1.2(e)(v).)

Viewing petitioner's wrongful conduct in light of these mitigating factors, we conclude that disbarment is not required in the interest of protecting the public, the courts and the legal profession, but that petitioner should be suspended from the practice of law as provided for in standard 3.2.

DISPOSITION

We therefore order that petitioner Paul I. Mostman be suspended from the practice of law for a period of five years, that execution of the order for suspension be stayed, that petitioner be placed on probation for a period of five years subject to actual suspension for the first two years of the period of probation, that during his period of actual suspension he take and pass the Professional Responsibility Examination, and that he comply with the additional terms of probation set forth in the recommended order of the review department. We further order that petitioner comply with the requirements of rule 955 of the California Rules of Court and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. This order is effective upon finality of this decision.

EAGLESON, J. Concurring and Dissenting.—I agree with the majority's conclusion that petitioner has committed acts evincing moral turpitude. His criminal conviction is, on its face, a serious one. By pleading guilty to the lesser charge, he admitted that he specifically intended to commit a dangerous felony (assault by means of force likely to produce great bodily harm), and that he asked another person to do the act. (Pen. Code, § 653f, subd. (a).) Despite thorough presentation of all mitigating evidence to the sentencing court, petitioner was sentenced to two years in state prison.

Of greatest concern here is that petitioner's *actual* wrongdoing is far more expansive than his conviction suggests. The record makes clear that petitioner intended to commit the ultimate act of *murder,* and paid money to guarantee that result. He also was willing to involve at least two other people (Donnelly and "partner") in the scheme, and had every reason to believe that they would commit the crime. By his own admission, it was a mere "fortuity" that no injury or death occurred.

Petitioner also has not convinced either the review department or this court that his crime was the product of overwhelming fear or panic. (Cf., *Montag* v. *State Bar* (1982) 32 Cal.3d 721 [186 Cal.Rptr. 894, 652 P.2d 1370].) Granted, he was the target of several acts of harassment, and believed that Roper was the cause. Yet the only incidents which could *reason-*

*ably* induce a fear of harm—the "death threat," the lug nut incident and the hit-and-run collision—all occurred a significant period of time before his criminal solicitation began. If, as petitioner contends, these events uncontrollably drove him to commit the crime, why did he wait several months before accepting Donnelly's standing offer to harm Roper? As suggested by the majority, the reason is that petitioner did not *actually* believe he and his family were in imminent danger, but decided to act only after his anger and "loathing" for Roper had peaked. (*Ante,* at p. 738.) No other conclusion is possible in light of statements he made during the taped conversations with Donnelly.

Because of petitioner's clear culpability, and the presence of only "routine" factors in mitigation, I dissent from the majority's decision to suspend, rather than disbar, petitioner.

In my view, little mitigating weight can be placed on petitioner's failure to take so-called "questionable" referrals from Roper. This conclusion is speculative, and overlooks the likelihood that petitioner declined to act for purely business reasons. And, while the instant misconduct did not involve a breach in the performance of professional services, the majority overlooks the well-settled notion that an attorney may be disciplined for misdeeds not directly arising out of the practice of law. (See *In re Rohan* (1978) 21 Cal.3d 195, 202-204 [145 Cal.Rptr. 855, 578 P.2d 102].)

The majority's willingness to accept petitioner's "conspiracy" theory is also troublesome. Such an approach shifts the responsibility for conceded bad acts away from petitioner. Regardless of the alleged motivations of others, there is no dispute that petitioner intended to harm, and ultimately to kill, another person for reasons which are professionally and socially unacceptable.

Another uncompelling factor is petitioner's troubled family history. While these problems are unfortunate, they fall within the realm of "normal" life occurrences. We have seen several cases in which an attorney has undergone marital or family health problems at the time he committed misconduct, but was nonetheless deserving of harsh discipline. (See, e.g., *Kent* v. *State Bar* (1987) 43 Cal.3d 729, 736-737 [239 Cal.Rptr. 77, 739 P.2d 1244]; *In re Nevill* (1985) 39 Cal.3d 729, 735-736 [217 Cal.Rptr. 841, 704 P.2d 1332]; cf., *Schneider* v. *State Bar* (1987) 43 Cal.3d 784, 799-801 [239 Cal.Rptr. 111, 739 P.2d 1279].) Some of the family illnesses cited by the majority herein occurred *10 years* before petitioner committed his crime.

Finally, undue emphasis has been placed on petitioner's remorse and cooperation with the State Bar. This cooperation occurred, of course, after serving his prison term. While it is a commendable stance for him to take, it should not obscure our analysis of the key issue at hand—petitioner's fitness

to practice law. (*In re Conflenti* (1981) 29 Cal.3d 120, 124-125 [172 Cal.Rptr. 203, 624 P.2d 253]; see also, *Rosenthal* v. *State Bar* (1987) 43 Cal.3d 658, 664 [238 Cal.Rptr. 394, 738 P.2d 740].) The source of petitioner's wrongdoing was his admitted inability to handle stressful situations. While he insists that he has learned to prevent a recurrence of stress buildup, he has not engaged in a meaningful and sustained period of unsupervised law-abiding activity. Although the crime occurred in 1982, petitioner's medical expert opined as recently as mid-1986 that additional therapy was necessary before a diagnosis of complete rehabilitation could be made. (Cf., *In re Nadrich* (1988) 44 Cal.3d 271, 279 [243 Cal.Rptr. 218, 747 P.2d 1146] [two years of noncustodial drug and alcohol rehabilitation insufficient to forestall disbarment where serious crime has been committed (in dictum)].) His current capacity to handle the pressures of a law practice and daily life is therefore uncertain.

Where "an attorney's misconduct is egregious and is not substantially mitigated by other circumstances, once is one time too many." (*In re Nevill, supra,* 39 Cal.3d at p. 736.) Here, the evidence shows petitioner's willingness to do whatever was necessary to take another person's life. The bar and the public should not be compelled to acquiesce in a determination that allows a person whose moral standard is so low, and whose judgment so lacking, to continue to wear the mantle of privilege and public trust that accompanies the calling of attorney at law. I would disbar petitioner.

Lucas, C. J., concurred.

Petitioner's application for a rehearing was denied February 23, 1989, and the opinion was modified to read as printed above.