[L.A. No. 32331. Mar. 3, 1988.]

GERALD G. GARLOW, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

694

**COUNSEL**

David A. Clare for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Richard J. Zanasi, Dianne Yu and Allen Blumenthal for Respondent.

**OPINION**

**THE COURT.—** The Review Department of the State Bar Court (hereafter Review Department) unanimously recommends that petitioner Gerald G. Garlow be disbarred. The recommendation is based on findings of the hearing panel of the State Bar Court (hereafter Hearing Panel), adopted in substantial part by the Review Department, that Garlow wilfully refused to turn over client funds, misappropriated disputed client-trust-account funds, refused to provide an accounting to clients, refused to communicate with clients, failed to perform certain services for clients, testified falsely before the Hearing Panel and induced his secretary to testify falsely, and made material misrepresentations on documents filed in the United States Bankruptcy Court.

 Garlow bears the burden of demonstrating that the State Bar's findings are not supported by the record. (*Trousil* v. *State Bar* (1985) 38 Cal.3d 337, 341 [211 Cal.Rptr. 525, 695 P.2d 1066].) After independently reviewing the evidence in this case, we adopt the Review Department's findings of fact and conclusions of law. Moreover, the seriousness of

Garlow's misconduct in the matters now before us and the fact that he has been privately reproved twice, publicly reproved once, and suspended by this court for prior serious misconduct leads us to conclude that disbarment is warranted and necessary for the protection of the public, the maintenance of high professional standards and the preservation of public confidence in the legal profession.

## I. *The Evelyn Perez Matter*

### A. *Findings of Fact*

The record supports the Review Department's findings that Garlow (1) wilfully refused to turn over money to his client which he had in his control and to which he had no claim, (2) wilfully withdrew money for his personal use from his client trust account which should have been held until a fee dispute was resolved, and (3) testified falsely before the Hearing Panel regarding the status of his client trust account.

In October of 1974, Evelyn Perez retained Garlow to handle the dissolution of her marriage. Garlow and Perez orally agreed that she would pay him $175 for the entire dissolution proceeding, but that more fees would be charged if the dissolution became complicated. Perez paid the $175, plus an additional $75 billed by Garlow.

The court ordered Perez's husband, Jimmy, to pay her attorney fees stemming from the dissolution action. Thereafter Garlow billed Jimmy directly for any additional fees and did not send Perez another bill. The final statement sent by Garlow to Jimmy indicated a balance due of $355.

A settlement agreement entered into by the Perezes provided that Jimmy would purchase the family home from Perez and that she would pay the $355 balance due on Garlow's attorney fees. The $355 amount was rounded off to $400 to cover any escrow charges arising from the sale of the house. Garlow signed the agreement without contesting the balance due him.

Pursuant to the settlement agreement, the purchase of the Perez home was placed in escrow.[1] Upon close of escrow, an escrow check made payable to Garlow and Perez in the amount of $24,000 was sent to Garlow's office. Perez intended to pay Garlow's $400 fee out of the proceeds of this check.

---

[1] Garlow testified that when Perez brought the escrow instructions to his office, he told her that there would be additional fees. Even if this is true, he nevertheless did not inform her what the additional fees would be, nor did he send her a bill or provide her with an accounting.

At the time Perez came to Garlow's office to pick up the check and pay Garlow his $400 fee, there was nothing further to be done in her case. Nevertheless, Garlow refused to endorse the $24,000 check to her unless she paid him $2,100. Perez was surprised by Garlow's request and asked him if he had documentation to support his increased fee. Garlow said he did not have such documentation, but added that if he had to provide her with an accounting he would charge her $5,000. Perez left Garlow's office without indorsing or obtaining the escrow check.

Perez sought advice from another attorney, E. Belmont Herring. Herring wrote several letters to Garlow requesting that Garlow endorse the $24,000 check over to Perez. Garlow refused, indicating that he planned to bring a motion in the family law court for resolution of the fee dispute. Herring advised Garlow that the family law court lacked jurisdiction to resolve the fee dispute. Nevertheless, Garlow brought a motion in that court. The court determined that it did not have jurisdiction to resolve the dispute.

Outside the courtroom, Herring and Garlow entered into an oral agreement whereby Garlow gave Herring the $24,000 check; Herring then gave $19,000 to Perez and the remaining $5,000 was given to Garlow to hold in his client trust account until the fee dispute was resolved. Herring advised Garlow that he should seek arbitration of the fee dispute through the State Bar. Herring did nothing further in the matter for two years, believing that Garlow and Perez had initiated arbitration. When Perez subsequently informed Herring that arbitration had never been sought and that Garlow had never forwarded any of the $5,000 to her, Herring initiated a civil suit against Garlow to recover the disputed sum. That suit has not resolved the dispute and no money has as yet been forthcoming from Garlow.

Garlow testified before the Hearing Panel that he deposited the $5,000 amount immediately in his client trust account at Pan American National Bank. He admitted, however, that he withdrew $2,100 from his trust account while the $5,000 was still in dispute, because he believed Perez owed him that amount. Garlow then testified that his trust account balance *never* fell below $2,700. Bank records, however, reveal that Garlow's testimony regarding the balance of his trust account was false. On numerous occasions his balance fell below $100, sometimes even below $10.

B. *Conclusions of the Review Department*

The Review Department concluded that Garlow's wilful withdrawal of disputed client funds for personal use violated rule 8-101(A) of the Rules of

Professional Conduct.[2] Moreover, the Review Department concluded that his withdrawal of funds and wilful refusal to pay over to his client those funds to which he had no claim violated Business and Professions Code section 6103,[3] and that Garlow's culpable conduct involved moral turpitude and dishonesty within the meaning of Business and Professions Code section 6106.[4]

The Review Department determined that there were no mitigating circumstances, but found the following aggravating circumstances: (1) that Garlow had a prior record of disciplinary proceedings, (2) that he evidenced indifference towards rectification or atonement for his misconduct by failing to restore to his client trust account or to his client any of the $5,000 amount, (3) that he exhibited a lack of candor by testifying falsely before the Hearing Panel regarding the balance of his trust account, and (4) that he exhibited bad faith, dishonesty, concealment, overreaching and other violations of the State Bar Act and the Rules of Professional Conduct by (i) failing to apprise his client that his fees would ever amount to $2,100 or $5,000, (ii) failing to provide an accounting to his client, and (iii) threatening to increase his fee when the client requested an accounting.

The Review Department concluded that disbarment was warranted.

## C. *Garlow's Contentions*

Garlow contends that the evidence was insufficient to support the Review Department's findings of fact and conclusions of law. He alleges that the overwhelming weight of the evidence supports the following contentions.

Garlow first contends that he performed substantial legal services for Perez for which she was obligated to pay and that he earned the $5,000 fee. This contention misses the point. Even if Garlow had in fact done sufficient work to justify a fee of $2,100 or $5,000, he nevertheless should

---

[2] Rule 8-101(A) provides in pertinent part: "All funds received or held for the benefit of clients by a member of the State Bar or firm of which he is a member, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labelled 'Trust Account' . . . . [¶] (2) . . . [W]hen the right of the member of the State Bar or firm of which he is a member to receive a portion of trust funds is disputed by the client, the disputed portion shall not be withdrawn until the dispute is finally resolved."

[3] Section 6103 provides: "A wilful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

[4] Section 6106 provides in pertinent part: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

have informed his client of his billing rates at the outset of their relationship. Moreover, he should have sent updated billing statements indicating that $355 was not the balance due, and should have provided Perez with an itemization of his bill upon request without threatening to double his fee. Finally, he should not have withdrawn substantially all of the funds held in his trust account until he had established through arbitration that he was entitled to the higher fee.

■ Garlow next contends that he acted in good faith and attempted to resolve the fee dispute immediately by filing a motion in the family law court. While it is true that he immediately brought a motion before the family law court to resolve the fee dispute, he nevertheless kept the $5,000 and did not seek further resolution of the dispute once the family law court determined that it lacked jurisdiction. Thus, while Garlow's initial effort might be laudable, he should have followed up. Instead, he has done nothing to resolve the dispute and has withdrawn substantially all of the funds in his client trust account.

■ Garlow next argues that the fee dispute has never been resolved because Perez opposed the jurisdiction of the family law court and waited several years before bringing suit against him. Garlow mistakenly argues that the family law court dismissed his motion on the basis of Perez's opposition, rather than the court's lack of jurisdiction to resolve the matter. Garlow cannot use his choice of an improper forum, a fact pointed out to him by Attorney Herring, as an excuse for his misappropriation. Nor can he exculpate himself from responsibility simply because Perez took several years to file suit against him.

■ Garlow makes a creative, if unmeritorious, argument in his sixth contention. A letter from Herring to Garlow dated April 27, 1979, outlined the stipulation reached by the two attorneys regarding the temporary disposition of the $5,000: "The enclosed check, as I understand it, is to be deposited into your trust account and held therein *pending further order of court* concerning the amount, if any, of attorney's fees owed to you by Ms. Perez. . . ." (Italics added.) Garlow argues that the language emphasized above means pending further order of the *family law* court. He then contends that since Perez opposed his motion in the family law court—thereby causing the court to determine that it did not have jurisdiction—the "condition precedent" to his right to the funds was satisfied and he was free to withdraw the funds from the trust account. It is evident from the language of the letter and the context of the stipulation, however, that Garlow was to keep the $5,000 in his trust account until the dispute was *settled* by further order of a court having jurisdiction to resolve the dispute. Garlow had no

right to withdraw the disputed funds simply because the family law court would not hear his motion.

■ In his seventh contention, Garlow argues that he did not intend to deceive the Hearing Panel regarding the continuing balance of his trust account. He claims that he was testifying from memory about account activity which occurred many years before and was simply mistaken about the continuing balance. The argument is unconvincing. Garlow testified without hesitation that his balance had never fallen below $2,700. It is difficult to believe that Garlow did not know his trust account balance had dropped below $10 on several occasions. The Hearing Panel was in the best position to determine the veracity of Garlow's testimony and his intent to mislead regarding the balance of his trust account. We rely heavily on the findings of the State Bar Court in disciplinary proceedings. (*Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962, 968 [239 Cal.Rptr. 675, 741 P.2d 172].) On this issue, we defer to its determinations of fact.

■ Alternatively, Garlow asserts that even if his testimony is found to be untruthful, it should have been stricken as irrelevant to the proceedings. He points out that if his withdrawal of funds from the trust account was wrong pursuant to rule 8-101(A), it is irrelevant whether he withdrew $2,100 or $4,999.

We agree that Garlow committed misconduct the moment his trust account balance dropped below $5,000. The problem with Garlow's attack on the relevancy of his testimony, however, is that it was his *own counsel* who elicited the testimony. More importantly, it is the *fact* of the false testimony that is relevant here, not whether the testimony itself was or was not relevant to an issue being tried.

## II. *The Dorothy Reniewich Matter*

### A. *Findings of Fact*

The record supports the Review Department's findings that Garlow (1) wilfully failed to communicate with his client, (2) wilfully failed to refund any portion of his $400 fee, and (3) committed perjury and subornation of perjury.

Dorothy Reniewich retained Garlow on December 8, 1982, to represent her in a dissolution of marriage action. Reniewich intended to substitute Garlow for another attorney who had worked on her dissolution. She paid him a total of $400 with the understanding that any court appearances would be in addition to the $400. Garlow informed Reniewich that he

would obtain a court date to secure a bifurcation of certain portions of her dissolution proceeding within six weeks.

Throughout 1983, Reniewich made numerous telephone calls to Garlow's office to determine the status of her case. Garlow purposefully avoided her calls and refused to return her calls. He testified that he avoided communication with her because she always asked the same questions and was "bugging the hell out of" him.

On May 27, 1983, Garlow sent Reniewich a letter stating that the motion for bifurcation was set for court hearing on June 16, 1983. Reniewich testified that she called Garlow's office twice on June 2, 1983, and once on June 13, 1983. She did not speak to Garlow, but one of his secretaries told her that they did not have her June 16th court appearance on their calendar. Reniewich told the secretary to have Garlow call her. He never did. On June 13, 14 and 15, Reniewich called the court for information on her court appearance. The court informed her that it did not have any such appearance scheduled for her case.

Garlow called Reniewich on the morning of June 16. Reniewich's boyfriend, Jerry McMillian, answered the phone. Garlow asked if they were ready to go to court; McMillian responded that there was no court appearance scheduled. Garlow expressed surprise and indicated that he would meet them in court. Reniewich and McMillian got ready for court and drove to the courthouse. Upon their arrival they discovered that there was no court appearance set for her case. Moreover, Garlow never showed up at the courthouse. Adding insult to injury, Reniewich was informed by the county clerk that Garlow was not even listed as her attorney of record.

After speaking with McMillian on the morning of the 16th, Garlow called the court and discovered the problem. He had sent the substitution-of-attorney form and the motion for bifurcation without enclosing the proper fee. The court had previously called Garlow's office in May to notify him of the problem and one of his secretaries indicated that the fee would be sent. However, the court never received the fee and thus the papers were never filed.

Garlow never attempted to meet Reniewich at the court or to communicate with her again. Nor did he attempt to resubmit the documents with the proper filing fee or return Reniewich's $400.

Reniewich made written demand on Garlow for return of her $400. Garlow did not respond. She also made two phone calls demanding her $400 and her file, without response. She then brought suit against Garlow in

small claims court. Garlow did not appear and the court rendered judgment against him for $400 plus court costs. Garlow testified that when he received the notice of judgment, he instructed Maria Gonzalez, one of his secretaries, to send Reniewich the money. However, the Review Department determined that Garlow's testimony that he told his secretary to send a check was knowingly false. Moreover, the Review Department further found that Garlow induced his secretary, Alma Cuevas, to testify falsely to corroborate his story. There are numerous inconsistencies in the testimony which support the Review Department's findings of false testimony, and we adopt those findings of fact.[5]

## B. *Conclusions of the Review Department*

The Review Department concluded that Garlow's misconduct violated rules 2-111(A)(3),[6] 6-101(A)(2)[7] and 6-101(B)(2)[8] of the Rules of Professional Conduct and Business and Professions Code section 6103. Moreover, the Review Department determined that Garlow's conduct involved moral turpitude and dishonesty within the meaning of Business and Professions Code section 6106.

---

[5] The following evidence supports a finding that Garlow and his secretary testified falsely before the Hearing Panel. First, although Garlow testified on June 24 that he had instructed Maria Gonzalez to mail the $400, on the very next day (June 25) he called Alma Cuevas, another secretary, who testified that *she* was the one whom Garlow had told to mail the check. Cuevas said she had forgotten to send the money. When asked on cross-examination how she remembered that she had forgotten to send the check, Cuevas replied that she had *not* remembered but that Garlow had reminded her that she had forgotten less than a week prior to her testimony. (If Garlow had reminded Cuevas one week earlier that she had forgotten to mail the $400, then he should have remembered during his testimony that it was Alma Cuevas rather than Maria Gonzalez whom he told to send the check.) Second, Cuevas said that she failed to issue the check because she was only working part-time in 1983 and it slipped her mind. However, the notice of judgment was received in April of 1984. By Cuevas's own admission, the notice was received after she had started working full-time for Garlow, and she could not have forgotten as a result of her part-time status. Third, Garlow had testified that he instructed his secretary in writing to pay the judgment, whereas Cuevas testified that he instructed her orally. Finally, Garlow testified that only he and Maria Gonzalez had check-writing authority in his office.

[6] Rule 2-111(A)(3) provides: "A member of the State Bar who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned. However, this rule shall not be applicable to a true retainer fee which is paid solely for the purpose of insuring the availability of the attorney for the matter."

[7] Rule 6-101(A)(2) provides: "A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently."

[8] Rule 6-101(B) provides in pertinent part: "(B) Unless the member associates or, where appropriate, professionally consults another lawyer who the member reasonably believes is competent, a member of the State Bar shall not . . . [¶] (2) Repeatedly accept employment or continue representation in legal matters when the member reasonably should know that the member does not have, or will not acquire before performance is required, sufficient time, resources and ability to, perform the matter with competence."

The Review Department found as a mitigating circumstance that the $400 amount was not substantial. However, the Review Department also found the following aggravating circumstances: (1) that Garlow's four prior disciplinary actions were for wilful failure to communicate with clients, showing a continuing pattern of misconduct, (2) that Garlow never refunded the $400 despite the small claims judgment against him, and (3) that Garlow testified falsely and induced his secretary to testify falsely.

The Review Department concluded that disbarment was warranted.

C. *Garlow's Contentions*

Garlow again attacks the sufficiency of the evidence to support the Review Department's findings of fact and conclusions of law. ■ He first argues that he performed all of the services for which he was retained until he was discharged and that he communicated with his client and kept her fully informed. We disagree. The overwhelming weight of the evidence shows that Garlow did not perform any of the services for which he was retained. He never became attorney of record, he never actually filed a motion for bifurcation, and he intentionally avoided communication with his client. Moreover, Garlow never tried to resubmit the motion for bifurcation with the proper filing fee.

■ Garlow next contends that he earned the $400 fee. He argues that he spent two or three hours on the case and that he rightfully could bill Reniewich close to $400 for that time. However, the oral retainer agreement between Reniewich and Garlow did not specify an hourly fee. It specified a result. Even if we accept Garlow's position that he was only retained to secure the bifurcation, it is clear that he did not achieve the result for which he was retained, nor did he make much of an effort to do so.

■ Garlow also argues that even though he earned the fee, he nevertheless attempted to pay the small claims judgment against him by directing his secretary to send a check to Reniewich. However, as we have already indicated, there is substantial evidence to support the Review Department's findings that Garlow and Alma Cuevas testified falsely about whether Garlow ever directed any of his employees to mail a check.

■ Garlow's next contention is that the Review Department's finding that he committed perjury and subornation of perjury should be stricken as a matter of law because the Hearing Panel made no such finding and was in a better position to determine such facts. Garlow bases his contention on the premise that because the Hearing Panel did not expressly find that Cuevas testified falsely, it must have believed that she was telling the truth.

We decline to adopt such reasoning. Moreover, rule 452 of the Rules of Procedure of the State Bar provides that the findings of the Hearing Panel shall only serve as a recommendation to the Review Department and that the Review Department has the authority to independently review the record and render findings of fact at variance with the Hearing Panel's findings. More importantly, we independently review the record and make our own determinations of fact. (*Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 689 [238 Cal.Rptr. 774, 739 P.2d 134]; *Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11 [206 Cal.Rptr. 373, 686 P.2d 1177].) Although we give great weight to the findings of the Hearing Panel, we conclude that the Panel was silent on this subject and that the record supports the added finding of the Review Department that Garlow testified falsely and that he induced Cuevas to testify falsely. (See fn. 5, *ante*.)

Garlow finally contends that his conduct did not violate Business and Professions Code sections 6103 or 6106, or rules 2-111(A)(3), 6-101(A)(2) and 6-101(B)(2) of the Rules of Professional Conduct. Garlow's primary argument is that rule 2-111(A)(3) requires that an attorney return unearned monies given to him by a client upon his "withdrawal" from service. Garlow argues that he did not "withdraw," he was fired, and therefore rule 2-111(A)(3) is inapplicable to him. Although it is true that Garlow was fired, he fails to recognize that he was fired because he effectively withdrew from representing Reniewich by failing to perform as agreed. His conscious decision to avoid her telephone calls and his failure to communicate the status of her court appearance or to resubmit the documents for filing evidence his withdrawal as diligent counsel. Thus, rule 2-111(A)(3) is definitely applicable to his misconduct in this case, as are rules 6-101(A)(2) because of his repeated failure to perform competently and 6-101(B)(2) because of his willingness to accept employment when he should have known he was not in a position to competently represent his client.

Finally, Business and Professions Code section 6103 states that conduct in violation of an attorney's oath is cause for suspension or disbarment. Garlow took an oath that he would abide by the rules of professional conduct promulgated by the State Bar of California. His violation of that oath subjects him to discipline under section 6103. Moreover, we agree with the conclusion of the Review Department that his intentional disregard of the small claims judgment and his perjury and subornation of perjury constitute moral turpitude and dishonesty within the meaning of Business and Professions Code section 6106.

III. *The Seda Kasabian Matter*

A. *Findings of Fact*

The record supports the Review Department's findings that Garlow (1) wilfully misappropriated his client's property for his own use, (2) wilfully refused to provide an accounting, and (3) made material misrepresentations to the United States Bankruptcy Court.

Seda Kasabian retained Garlow in August 1981 to secure a stay on the impending foreclosure of her home. Garlow suggested a Chapter Xl bankruptcy proceeding and required a $3,000 retainer before he filed any papers. Kasabian did not have $3,000 in cash to pay Garlow's retainer, but orally agreed to give him five rings worth $3,500 as security for her future payment. The rings were from the inventory of Kasabian's jewelry business. Garlow did not advise Kasabian that any property transfer between an attorney and client must be approved by the bankruptcy court.

Garlow completed a petition for bankruptcy and filed it with the United States Bankruptcy Court. The stay of foreclosure was granted. Garlow did not inform the court that he had accepted Kasabian's business inventory as security for his fee despite at least two questions in the petition for bankruptcy specifically inquiring about legal fees and property transfers. Garlow's response to these questions on the petition was "Not Applicable." Garlow testified that he did not think his fee agreement was relevant in a Chapter XI proceeding.

Early in 1982, Kasabian exchanged a personal ring for the five "inventory rings" in the hopes that she could sell the five rings to pay Garlow. Around the same time, she began making cash payments to Garlow totalling $1,400. Later she exchanged three rings for the personal ring.[9] She testified that she also made numerous requests for an itemization to determine how much she owed, but never received one.

Kasabian testified that in early June of 1982 she received a phone call from one of Garlow's secretaries. The secretary said Garlow was flashing Kasabian's rings around the office and calling jewelers in an effort to sell the three rings. Kasabian called Garlow and asked for her rings back. Garlow said he would not return them unless she paid him the balance due. A few days later, Kasabian went to Garlow's office with a friend named Mickey Walker. They spoke directly to Garlow and demanded the three rings back.

---

[9] Kasabian testified that she wanted her personal ring back because she had heard from one of Garlow's secretaries that Garlow's wife had been wearing it.

Garlow told them he did not have the rings anymore. Garlow later testified that he had sold the rings by that time.

Kasabian made a written demand upon Garlow for return of her three rings. Garlow's office received the letter, but Garlow did not respond. Kasabian had no further communication with Garlow and never received her rings or a refund of her $1,400 payment. .

### B. *Conclusions of the Review Department*

The Review Department concluded that Garlow violated rules 8-101(A), 8-101(B)(3)[10] and 8-101(B)(4)[11] of the Rules of Professional Conduct and section 6103 of the Business and Professions Code. The Review Department also determined that Garlow's misconduct involved moral turpitude and dishonesty within the meaning of Business and Professions Code section 6106.

The Review Department determined that there were no mitigating circumstances, but found the following aggravating circumstances: (1) Garlow's prior disciplinary record; (2) the fact that his misconduct was not an isolated act but instead evidenced multiple acts of wrongdoing and a pattern of misconduct; and (3) that his conduct demonstrated indifference toward rectification or atonement because he never gave Kasabian an accounting and never returned her funds or property.

The Review Department concluded that disbarment was warranted.

### C. *Garlow's Contentions*

Garlow first alleges that Kasabian transferred the rings to him as payment in full with the understanding that she could *repurchase* them within a certain undisclosed time period. Kasabian never repurchased the rings, he argues, and therefore they were his to do with as he wished. The record, however, supports Kasabian's position that the rings were given to Garlow as security for future cash payment. This is evidenced by the fact that Garlow directed his secretaries to call Kasabian regularly to demand

---

[10] Rule 8-101(B)(3) provides: "(B) A member of the State Bar shall: . . . [¶] (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the member of the State Bar and render appropriate accounts to his client regarding them; preserve such records for a period of no less than five years after final appropriate distribution of such funds or properties; and comply with any order for an audit of such records issued pursuant to the Rules of Procedure of the State Bar."

[11] Rule 8-101(B)(4) provides: "(B) A member of the State Bar shall: . . . [¶] (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the member of the State Bar which the client is entitled to receive."

payment. Moreover, Garlow's ledgers indicated that there was a "balance due" on Kasabian's account in excess of $3,000. Finally, Garlow allowed Kasabian to exchange the rings with other rings of lesser value following her partial cash payment. These facts are inconsistent with Garlow's contention that the rings constituted payment in full. We therefore conclude that the rings were to be held as security and that Garlow misappropriated them for his own purposes.

 Garlow's next contention is that Kasabian urgently needed his services. That fact is irrelevant. Garlow also argues that he performed substantial services for Kasabian, earned the fee paid (i.e., the rings and the $1,400 cash payment) and there was no misappropriation. This argument misses the point. There is no doubt that Garlow obtained a stay for Kasabian and filed the bankruptcy petition for her. The issue here, however, is whether he misappropriated part of her business inventory while the status of the property was in dispute. Even if he was entitled to a $3,000 fee, he should have held the property in trust until the dispute was settled and should have completely disclosed his fee agreement to the bankruptcy court.

 Garlow further alleges that Kasabian never requested an accounting. However, there is ample testimony in the record indicating otherwise. The Hearing Panel was in the best position to determine the credibility of this testimony and we defer to its finding that an accounting was requested and that Garlow failed to provide one.

 Garlow next contends that the misrepresentation in the bankruptcy petition was simply a typographical error and not the result of culpable conduct. He points to the fact that the response to question 19, subpart "b" of the petition should have been typed under question 20, subpart "b."[12] However, even if the intended response had been placed in the correct space, it still would not have informed the court that Garlow had accepted some of Kasabian's business inventory as security for his fee. Moreover, on the last page of the petition, the document has a space which reads: "I agreed to turn over or give a security interest in the following property." In response, the secretary typed "Not Applicable." This omission is not a typographical error; it is a false statement.

There is no evidence that Garlow actually directed his secretary to type in the misleading information. However, there is evidence that Garlow

---

[12] Question 20, subpart "b" asks: "Have you . . . paid any money or transferred any property to the attorney . . .?" In response, Garlow's secretary typed "Not Applicable." However, under question 19, subpart "b" which asks "If the petitioner is a partnership or corporation, state what withdrawals . . . have been made by any member of the partnership. . . ," the secretary typed "$3,000 for stay and $100./hour if $3,000 is expended." Thus, it appears that the secretary typed the response to question 20 under question 19.

knew property transfers and fee agreements involving business inventory had to be approved by the bankruptcy court. It is also clear that he did not make any effort to notify the court that he had accepted business inventory from Kasabian. These facts support the Review Department's finding that he made intentional misrepresentations to the United States Bankruptcy Court.

 Finally, Garlow contends that he did not violate rule 8-101 of the Rules of Professional Conduct. We disagree. Garlow was required under rule 8-101 to hold the rings in trust until the dispute over the disposition of the rings was resolved. He violated this rule when he sold the rings. Moreover, rule 8-101 required him to keep adequate records of the property and payments given to him, but he failed to do so. Finally, he was required to promptly return any property or money which the client was entitled to receive. However, he sold the rings and kept the $1,400.

## IV. *Aggravating Factors*

### A. *Garlow's Prior Disciplinary Record*

Garlow received a private reproval in 1976 for wilful failure to perform services for which he had been retained and wilful misrepresentation to his clients regarding the status of the case. He also received a private reproval in 1978 for wilful failure to perform services for which he had been retained, wilful failure to communicate with his clients and wilful failure to return documents belonging to his clients. In 1980 he was publicly reproved for wilful misrepresentations to the court and failure to prosecute an appeal with due diligence. Finally, he received a one-year suspension, stayed, with six months actual suspension in 1982 (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912 [180 Cal.Rptr. 831, 640 P.2d 1106]) for wilful misrepresentation to the court and urging his client to give false corroborating testimony.

 Garlow admits that his prior record is an aggravating factor, but argues that the weight to be given his record should be lessened because the priors occurred long ago and the discipline imposed was relatively light. Garlow cites *McCray* v. *State Bar* (1985) 38 Cal.3d 257, 274 [211 Cal.Rptr. 691, 696 P.2d 83] as support for his contention. The facts of this case, however, are distinguishable from those in *McCray*. In that case, much of the prior discipline had occurred a decade earlier. Moreover, the discipline consisted of probation with only one month of actual suspension, and the petitioner had already corrected the office procedures which led to his discipline. (*Id*. at p. 274.) In contrast, the current complaints against Garlow were brought soon after his most recent prior disciplinary proceeding. That proceeding resulted in six months actual suspension, which was more

serious than the disciplinary action taken in *McCray*. Finally, Garlow has not taken any steps to correct the problem or to indicate his reform. Given these facts, we do not agree that the aggravating factors should be given less weight.

## B. *Pattern of Misconduct*

Garlow's disciplinary record shows that he has on several occasions made false statements to the courts, withdrawn from communication with clients, failed to perform services for which he was retained, failed to return client documents and property, and induced others to testify falsely. Such a record evidences a serious pattern of misconduct involving recurring types of wrongdoing. There is no indication that he has made any attempt to reform or that he will do so in the future.

## C. *Lack of Candor*

The Review Department correctly determined that Garlow's false testimony to the Hearing Panel and his conduct in inducing his secretary, Alma Cuevas, to testify falsely constituted an aggravating circumstance.

## D. *Failure to Rectify Misconduct*

Garlow has exhibited little remorse for his misconduct and has never offered to return misappropriated money or property to his clients, despite express written demands upon him and a small claims judgment against him.

## V. *Mitigating Factors*

Garlow argues that the Review Department failed to acknowledge the following mitigating circumstances: (1) that he handles a large volume of cases, (2) that he has performed substantial pro bono work in his community, (3) that two members of the State Bar testified to his competence and good character, and (4) that the State Bar significantly delayed the initiation of this disciplinary proceeding.

The fact that Garlow handles a large number of cases does not mitigate his misconduct. In fact, it lends support to the conclusion that he violated rule 6-101(B)(2) by accepting employment without sufficient resources to serve the client in a competent manner.[13]

---

[13] Garlow quotes language from *Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 857-858 [100 Cal.Rptr. 713, 494 P.2d 1257] to support his contention that we consider a heavy caseload to

While the remainder of Garlow's contentions may have merit, we do not think they rise to such a level as to affect the outcome of this proceeding. Given the gravity of his misconduct and the severity of the aggravating circumstances, we conclude that the factors offered by Garlow do little to mitigate his wrongdoing or to persuade us that a lesser discipline is warranted.

## VI. *Conclusion*

For the foregoing reasons, we conclude that disbarment is warranted and necessary for the protection of the public, the maintenance of high professional standards and the preservation of public confidence in the legal profession.

Accordingly, we adopt the recommendation of the Review Department. It is ordered that Garlow be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is further ordered that Garlow comply with rule 955 of the California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon finality of the decision.

---

be a mitigating factor. While we stated in *Vaughn* that we were "cognizant of the difficulties faced by practitioners who handle a large volume of cases," we added that we did not condone the negligent operation of a law office.