[No. S006239. June 11, 1990.]

JOHN J. HARTFORD, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Alan M. Phillips and Robert K. Johnson for Petitioner.

Diane C. Yu, Richard J. Zanassi, Truitt A. Richey, Jr., and Phyllis Culp for Respondent.

---

OPINION

THE COURT.—The Review Department of the State Bar Court (Review Department) has recommended that John J. Hartford (petitioner) be suspended from the practice of law for six months, that execution of the suspension order be stayed and that petitioner be placed on probation for one year, subject to conditions, including actual suspension for thirty days.

In one matter, the Review Department found petitioner failed to communicate with his clients and failed to take timely or substantial action in the case for which he was retained; in a second matter, the Review Department found petitioner improperly sold stock deposited with him as a pledge, in violation of the pledge agreement and without notice to the pledgor.

Petitioner contends that the evidence was insufficient to sustain the findings of the Review Department, and further contends the discipline is excessive.

After reviewing the evidence and the findings, we conclude the evidence was sufficient to support the findings as to count 1 (Rules Prof. Conduct, former rule 6-101 [failure to act competently; i.e., failure to communicate, failure to perform substantially or diligently]).[1] In addition, although we hold the evidence with respect to count 2 does not support a finding of violation of rule 8-101(A) (placing funds in trust account; prohibition against commingling of trust funds),[2] we conclude that petitioner's conduct

---

[1] On May 27, 1989, new Rules of Professional Conduct became operative. All references to the rules herein, unless otherwise stated, are to the former Rules of Professional Conduct of the State Bar of California.

Rule 6-101 concerned the failure to act competently (see current rule 3-110) and provided in relevant part: "(A) [¶] . . . [¶] (2) A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently. [¶] (B) Unless the member associates or, where appropriate, professionally consults another lawyer who the member reasonably believes is competent, a member of the State Bar shall not [¶] (1) Accept employment or continue representation in a legal matter when the member knows that the member does not have, or will not acquire before performance is required, sufficient time, resources and ability to, perform the matter with competence . . . ."

[2] Rule 8-101 related to preservation of the funds and property of a client (see current rule 4-100). Rule 8-101(A) provided that funds held for the benefit of a client must be held in an

in selling the pledged stock without notice did constitute a violation of his oath and duties as an attorney. (Bus. & Prof. Code, §§ 6068, subd. (a), 6103.) Petitioner has failed to sustain his burden of showing the recommended discipline is erroneous or unlawful. (*Hawkins* v. *State Bar* (1979) 23 Cal.3d 622 [153 Cal.Rptr. 234, 591 P.2d 524].) Accordingly, we adopt the recommendation of the Review Department.

FACTS

Petitioner was admitted to practice in California on January 5, 1972. He has no prior record of discipline.

By a notice to show cause, petitioner was charged with misconduct in the two counts here under review.[3] In count 1, petitioner was charged with violation of his oath and duties as an attorney under Business and Professions Code sections 6068, subdivision (a) and 6103[4] and with violation of rules 6-101(A)(2) and 6-101(B)(1). Petitioner was charged in count 2 with violation of his oath and duties as an attorney (§§ 6068, subd. (a), 6103), conduct involving moral turpitude (§ 6106),[5] and with violation of rules 6-101(A)(2), 6-101(B)(1), and 8-101(A).

---

identifiable trust account and the attorney's funds shall not be commingled with the funds in the trust account (except for funds for bank charges, and any partially unearned or disputed amounts). Rule 8-101(B) provided that an attorney should immediately notify the client of receipt of the client's funds, securities or property; identify, label and place in safekeeping the client's property; maintain complete records of the client's funds, securities or property; and promptly pay or deliver to the client any funds, securities or property the client is entitled to receive. (See discussion, *post*, pp. 1146, 1152-1153.)

[3] A third count was charged in the notice to show cause, but after hearing the hearing panel found no violations as to the matters charged therein. We therefore do not address that count.

[4] All statutory references herein are to the Business and Professions Code unless otherwise stated.

Section 6068 sets forth the duties of an attorney. Before 1986, subdivision (a) provided: "It is the duty of an attorney: [¶] (a) To support the Constitution and laws of the United States and of this State." Section 6068 was amended in 1985, 1986 and 1988. The amendments did not materially affect subdivision (a). It now reads: "It is the duty of an attorney to do all of the following: [¶] (a) To support the Constitution and laws of the United States and of this state." (See Stats. 1985, ch. 453, § 11, p. 1752; Stats. 1986, ch. 475, § 2, p. 1772; Stats. 1988, ch. 1159, § 5, No. 4 Deering's Adv. Legis. Service, p. 4138, No. 11 West's Cal. Legis. Service, p. 2789.)

Section 6103 provides in relevant part that: ". . . any violation of the oath taken by [an attorney], or of his duties as such attorney, constitute[s] cause[] for disbarment or suspension."

[5] Section 6106 provides: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension. [¶] If the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding is not a condition precedent to disbarment or suspension from practice therefor."

The evidence and the findings and conclusions of the hearing panel, which were adopted essentially unchanged by the Review Department, indicated the following:

## 1. The Orth, Chinn and Licardo Matter (Count 1)

William Orth, Dennis Chinn, Eugene Licardo, and others, purchased interests in video game machines from John Potenza. First Interstate Vending, Inc. (Vidcom),[6] operated the video games for the Potenza group owners. At some point, however, Vidcom stopped paying the owners their share of the revenues from the games.

In August 1984 a group of the owners, including Potenza, Orth, Chinn, Licardo, and Vernon Lane, retained petitioner to investigate and take appropriate action against Vidcom. Under the retainer agreement, petitioner was to investigate the corporate status and assets of Vidcom and, if advisable, to file an action against Vidcom. Each member of the client group paid petitioner $200 as initial attorney fees.

Petitioner requested and received narrative statements from each of the clients. He also sent a letter to the Secretary of State inquiring into Vidcom's corporate status, and sent letters to the county clerk in Santa Clara and San Diego Counties inquiring about fictitious business name statements. Thereafter, however, petitioner did not make any further inquiry into Vidcom's corporate status and did not investigate the nature or extent of Vidcom's assets.

In the weeks following the initial meeting, Orth, Chinn and Licardo each telephoned petitioner's office numerous times to inquire about the status of their case, but petitioner did not return their telephone calls. Attempts to visit petitioner at his office were also fruitless.

On or about December 15, 1984, Orth, Chinn and Licardo each sent petitioner identical letters, stating that if they did not hear from petitioner by January 15, 1985, they would consider his employment terminated. Petitioner did not reply to the December 15, 1984, letters.

In early 1985, both Licardo and Chinn complained to the State Bar.

Finally, in September 1985, after he had been contacted by the State Bar, petitioner filed a complaint against Vidcom. In a letter to his clients, dated

---

[6] For convenience, the entity First Interstate Vending, Inc., will be referred to as Vidcom. It was unclear from the testimony at the hearing, however, whether Vidcom and First Interstate Vending, Inc., were in fact the same entity. That was one of the matters petitioner was retained to, but did not, investigate.

October 3, 1985, however, petitioner explained his rationale for delay in the filing and service of the complaint; it was his view that Vidcom's claims that the video equipment was valueless would appear less plausible the longer Vidcom did not either return the equipment or pay the overdue moneys.

In the meantime, Lane and Orth (but not Chinn or Licardo) had settled separately with Vidcom in exchange for some shares of stock.

Petitioner appears to have done nothing further with the case until February 11, 1986, when he sent his clients a letter stating that he had heard some members of the group wanted to drop the lawsuit and have their fees returned. He expressed no objections, but pointed out that the clients remaining in the group would be required to bear a larger proportionate share of the attorney fees. Orth, Chinn and Licardo each replied to petitioner's letter of February 11, 1986, demanding a refund of the initial fees paid. At the time of the State Bar hearing, petitioner had not returned the fees. After the hearing, he did refund the initial $200 paid by Orth, Chinn and Licardo.

The hearing panel found clear and convincing evidence petitioner had failed to communicate with his clients. The hearing panel also found petitioner failed to file a complaint in the action until September 1985, after Orth, Chinn and Licardo had complained to the State Bar. Moreover, although petitioner did make prompt inquiries into Vidcom's status, he made no investigation of Vidcom's assets as he had promised to do.

In mitigation of this misconduct, the hearing panel found that petitioner reasonably believed he was to communicate primarily with one or two "spokespersons" for the client group (Potenza and Lane) rather than with each client individually, in order to keep attorney fees down for the group as a whole.[7] The hearing panel found as further mitigation that, between September 1984 and November 1984, petitioner suffered a disabling head injury which prevented him from attending to his legal business.

The hearing panel also found the failure to file a timely complaint was mitigated by petitioner's belief that the case might settle, the fact that the statute of limitations had not yet run, and the fact that the decline in value of the video games and assets of Vidcom would result in a decreased recovery to the clients.

The hearing panel also made the following findings in mitigation: Petitioner ultimately returned the clients' fees, he had no record of prior discipline, and he was cooperative in the State Bar proceedings.

---

[7] Lane, one of the designated clients with whom petitioner was to communicate, testified, however, to numerous attempts to communicate with petitioner and the lack of any reply.

The Review Department adopted the findings and conclusions of the hearing panel, concluding that petitioner had failed to communicate with Orth, Chinn and Licardo in violation of rule 6-101, and that petitioner did not take timely or substantial action in the clients' suit against Vidcom in violation of rule 6-101(B)(2).

## 2. The Harris and Crist Matter (Count 2)

Sherwin Harris and Hewlitt Crist were general partners in a limited partnership operating the California Professional Music Academy. They hired petitioner in July 1981 to file suit against Barbara Tallmadge, one of the limited partners, and others, for breach of the partnership agreement in failing to make the required partnership contribution. Harris and Crist signed a fee agreement, agreeing to pay petitioner an hourly rate for attorney fees.

Petitioner prepared the case for trial. Trial was set for June 6, 1983. Near the date of trial, however, petitioner advised Harris and Crist that over $10,000 in unpaid attorney fees had accrued, and that substantial other expenses would be required to hire experts for the trial. Petitioner advised Harris and Crist that he would not proceed to trial unless he had some assurance that the attorney fees and expert witness costs would be paid.

Harris arranged with James Knapton, a friend who was also involved in the California Professional Music Academy enterprise but who was not a party to the lawsuit, to deliver a certificate representing 125 shares of stock in Tektronix, Inc., to petitioner as security for payment of petitioner's fees and the litigation expenses. Harris, Crist and Knapton executed a written agreement among themselves, reciting that petitioner had informed them that he needed approximately $10,000 in order to pursue the lawsuit. The relevant provisions of the pledge agreement are set forth in the margin.[8] Petitioner was not a party to the agreement, but he did sign it as a witness.

---

[8] The agreement stated that the $10,000 amount "would not need to be paid at this time but would need to be [g]uaranteed to be paid at some future date after the conclusion of the suit, regardless of the outcome of the lawsuit. [¶] Knapton has a stock certificate for 125 shares of common stock of Tektronix Inc., a N.Y.S.E. stock. [Petitioner] has agreed that a pledge of such a certificate would satisfy his requirements." It further provided: "1. Knapton will pledge his stock certificate for the guarantee. [¶] . . . [¶] 3. Parties agree that *all* attorneys fees are to be deducted from the total award to Harris and Crist so as to preclude the necessity of ever cashing in the stock certificate and requiring Knapton to pay. In the event the total award is not sufficient to cover the attorneys fee then it is for this purpose alone it was contemplated the pledge was made and the certificate would be used for such payment to attorney only and Harris and Crist would not be obligated to Knapton for any such payment made by him . . . ." (Italics in original.) In the event Harris and Crist recovered amounts in excess of all attorney fees, they agreed to give Knapton a share of the amounts they collected.

The June 6, 1983, trial date was continued until August 1983 because of the serious illness of defendant Barbara Tallmadge. Because of Tallmadge's continued illness, the August trial date was ultimately vacated and trial was set for May 1984. In February 1984, before the scheduled May trial date, Tallmadge died.

Sometime between August 1983 and May 1984, petitioner sold the stock without notice to Harris, Crist, or Knapton. On May 7, 1984, petitioner advised Harris of the sale. The proceeds of $8,400 were applied to fees then owed to petitioner in the Tallmadge action. Petitioner thereafter moved to withdraw from the case and took no further action to bring the case to trial.

The hearing panel found: (1) although petitioner was not a party to the agreement, he did sign it as a witness and knew its contents; (2) petitioner was not authorized under the agreement to sell the stock when he did; and (3) after Tallmadge's death petitioner took no effective action in the case and did not properly investigate the estate assets in the mistaken belief that Tallmadge's estate had few, if any, assets. The estate did, in fact, have substantial assets.

In mitigation, the hearing panel found that at the time of the sale of the Tektronix, Inc., stock, Harris and Crist owed petitioner over $10,000 in accrued attorney fees. Thus, application of the proceeds of sale of the stock to the overdue attorney fees did not result in any unwarranted gain to petitioner. There was no evidence petitioner intended to defraud his clients or Knapton with respect to the stock certificate agreement; rather, petitioner was mistaken in his interpretation of it. Petitioner also ultimately entered into an agreement to return the Tektronix, Inc., stock to Knapton. In addition, the hearing panel again noted petitioner's lack of prior disciplinary record and his cooperation in the State Bar proceedings.

The Review Department adopted the findings and conclusions of the hearing panel and determined that petitioner's conduct in selling the stock violated rule 8-101(A).[9]

As to both matters, the Review Department recommended that petitioner be suspended for six months, that the execution of the suspension be stayed and petitioner be placed on probation for one year, upon terms including

---

[9] As to both counts, the Review Department adopted the findings of the hearing panel by a vote of 13 to 2. In a comment evidently directed at count 2, one of the dissenting members was of the opinion there was no proof of a wilful violation of rule 8-101, and no charge of violation of rule 8-101(B). (See discussion, *post*, p. 1151 et seq.].) The recommendation of discipline was adopted by a vote of 12 to 3, the third dissenting member so voting on the ground the discipline was insufficient.

thirty days' actual suspension. The Review Department further recommended that petitioner take and pass the Professional Responsibility Examination.

## CONTENTIONS

Petitioner contends that the evidence is not sufficient to support the findings and conclusions of the Review Department. He further contends the recommended discipline is unduly harsh in light of the facts and circumstances of the case.

## DISCUSSION

### 1. The Orth, Chinn and Licardo Matter (Count 1)

■ We begin by noting that petitioner bears the burden of showing that the State Bar's findings are not supported by substantial evidence. (*Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 736 [187 Cal.Rptr. 30, 653 P.2d 321].) ■ In assessing the evidence, "[a]lthough we independently examine the record, we give great weight to the findings below, especially when they are based on conflicting testimony." (*Van Sloten* v. *State Bar* (1989) 48 Cal.3d 921, 931 [258 Cal.Rptr. 235, 771 P.2d 1323].)

■ Petitioner argues first that Orth, Chinn and Licardo were not his clients, but rather that the "client" was the entire group of video game owners. Petitioner contends he ably and efficiently represented "the group," which was satisfied with the litigation "plan" petitioner proposed.[10] He characterizes Orth, Chinn and Licardo as a "dissident minority," who wanted out of the group because they had made an independent settlement with Vidcom. Therefore, petitioner asserts, the evidence does not support the finding he failed to communicate with his clients or failed to diligently perform the work for which he was engaged.

Petitioner's premises are flawed. The evidence shows that Orth, Chinn, and Licardo were individual clients of petitioner and each deserved adequate representation. If petitioner perceived a previously unrecognized

---

[10] Petitioner testified that he told the clients at the initial meeting that he was not concerned about prompt filing of the complaint because (1) the statute of limitations had quite some time to run, (2) the clients might not wish to risk losing a lawsuit because there was an attorney fees clause in the contract for the operation of the video games, and (3) some of the clients had received tentative offers for settlement from Vidcom. He testified that it was therefore contemplated from the first that some of the clients might not wish to participate ultimately in a lawsuit and that he was waiting for the clients to advise him whether they wished to pursue active litigation.

conflict between the interests of some of the clients, he should have apprised them of the fact, advised them to retain separate counsel, and sought to withdraw from representation.

In addition, the evidence does not support petitioner's claim that the clients agreed to his proposed "plan" of delay. First, Orth, Chinn and Licardo all testified that they expected petitioner to act promptly. Second, petitioner's asserted "plan" of delay makes little sense. If, as petitioner acknowledges, the value of the video equipment was rapidly declining, he should have acted more, not less, promptly to preserve his clients' rights. As far as the record shows, petitioner never discovered the relationship between Vidcom and First Interstate Vending, Inc., never communicated what little he did discover to the clients, and never contacted or negotiated on the clients' behalf with anyone at Vidcom. Third, petitioner's claim he was waiting for the clients to advise him which members of the group would ultimately wish to participate in the lawsuit is belied by the fact that the clients could not intelligently make such a decision without information as to the status and assets of Vidcom, which information petitioner never provided. Fourth, petitioner knew about the numerous telephone calls from Orth, Chinn and Licardo, as well as the letters of December 15, 1984, to which he did not reply. Thus, he should have been on notice that these clients at least were not aware of, or did not agree with, a policy of delay. Petitioner never presented the proposed "plan" in writing until his letter of October 3, 1985, over a year after he had been retained, after Orth, Chinn and Licardo had written to him asking for a status report, and after Chinn and Licardo had complained to the State Bar.

Although petitioner asserts he communicated regularly with a "spokesperson" for the client group, rather than with each client individually, one of the designated spokespersons, Vernon Lane, testified to numerous difficulties communicating with petitioner.

Petitioner's characterization of Orth, Chinn and Licardo as a "dissident minority" who had effected their own settlement is, in reality, an effort to blame the clients for petitioner's misconduct. Although Lane (not one of the complaining clients) and Orth settled independently with Vidcom, Chinn and Licardo did not. The settlements were consummated after the time that Orth, Chinn and Licardo had notified petitioner that they considered his services terminated.

In sum, the evidence with respect to the first count fully supports the findings that petitioner failed in his duty to communicate with his clients and failed to perform substantially the services for which he was retained.

## 2. The Harris and Crist Matter (Count 2)

With respect to count 2, the sale of the pledged stock, we conclude that the evidence does not support a finding of violation of rule 8-101(A), but that petitioner nevertheless violated his oath and duties as an attorney.

■ Petitioner argues that a finding under rule 8-101(A) is improper because the rule refers to the holding of a client's "funds," not "property," in trust, and is applicable to a "client," not a nonclient such as Knapton. In essence, petitioner contends he did not receive proper notice of the charge for which he was disciplined.

Rule 8-101(A) provided that "All *funds* received or held for the benefit of clients . . . shall be deposited in one or more identifiable bank accounts labelled 'Trust Account', 'Client's Funds Account' or words of similar import . . . ." (Italics added.) The stock certificate, although held "for the benefit" of clients Harris and Crist, was not "funds" that could be deposited in a bank trust account. The finding of a violation of rule 8-101(A) simply cannot be sustained by the evidence, as the rule has no applicability to petitioner's holding of the stock certificate.

■ Neither can petitioner be disciplined for this conduct as a violation of rule 8-101(B), which refers to preservation of a client's "funds, securities, or other properties." As a dissenting member of the Review Department pointed out, petitioner was not charged in the notice to show cause with a violation of rule 8-101(B). (See *ante*, fn. 9.) We have held that an attorney may not ordinarily be disciplined on a matter not charged in the notice to show cause. (*Woodard* v. *State Bar* (1940) 16 Cal.2d 755 [108 P.2d 407].)

In *Woodard* v. *State Bar, supra*, an attorney was cited to show cause why he should not be disciplined on certain charges, but discipline was imposed on additional charges not included in the notice to show cause. We disapproved such a procedure and stated that, where the evidence brings to light other offenses not charged, the notice to show cause should be amended, as provided in the Rules of Procedure of the State Bar, to set forth the additional charges. (16 Cal.2d at p. 757.)

In *Gendron* v. *State Bar* (1983) 35 Cal.3d 409 [197 Cal.Rptr. 590, 673 P.2d 260], we stated that the failure to amend the notice to show cause could violate the attorney's right to due process if he is disciplined for uncharged violations. In *Gendron*, the State Bar did move to amend the notice to show cause, but the referee never ruled on the motion. We concluded that under those circumstances the State Bar could not impose discipline on any charge not contained in the original notice. (*Id.* at p. 420;

but cf. *Sullins* v. *State Bar* (1975) 15 Cal.3d 609, 618 [125 Cal.Rptr. 471, 542 P.2d 631].)

Here, the State Bar did *not* move to amend the notice to show cause. The circumstances are therefore analogous to those in *Gendron*, and discipline will not be imposed on the basis of a violation of rule 8-101(B).

Petitioner also contends that rule 8-101(B) is inapplicable to his conduct with respect to Knapton's property, because Knapton was not his client. We need not decide the issue, in view of our ultimate resolution of the case. Nevertheless, as the point was extensively argued, we discuss it briefly.

Rule 8-101(B) provided in relevant part: "(B) A member of the State Bar shall: [¶] (1) Promptly notify *a client* of the receipt of his funds, securities, or other properties. [¶] (2) Identify and label securities and properties *of a client* promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable. [¶] (3) Maintain complete records of all funds, securities, and other properties *of a client* coming into the possession of the member of the State Bar and render appropriate accounts *to his client* regarding them; . . . [¶] (4) Promptly pay or deliver *to the client* as requested *by a client* the funds, securities, or other properties in the possession of the member of the State Bar which *the client* is entitled to receive." (Italics added.)

Petitioner suggests, with some force, that rule 8-101(B) by its own terms refers only to the preservation of the funds, securities and properties "of a client." Rule 8-101(A), by contrast, directs the attorney to place in the client trust account any funds "received *or held for the benefit* of clients." (Italics added.) Rule 8-101(B) does not contain similar "for the benefit" language. In addition, petitioner points out that the hearing panel's findings, adopted by the Review Department, stated that Knapton, the pledgor of the stock, was *not* petitioner's client.

The Review Department's specific finding, although entitled to great weight (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11 [206 Cal.Rptr. 373, 686 P.2d 1177]), is not conclusive of the matter. In attorney discipline matters, we review the evidence and its sufficiency independently. (*Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 689 [238 Cal.Rptr. 774, 739 P.2d 134].)

There is a substantial argument that Knapton was a client within the meaning of rule 8-101(B). In *Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962 [239 Cal.Rptr. 675, 741 P.2d 172, 65 A.L.R.4th 1], an attorney representing the husband in a dissolution action received funds in which both the client husband and the nonclient wife had an interest. The attorney

misappropriated, commingled and failed to account for the funds. The attorney argued that, as the wife was represented by separate counsel and she was not his client, he had no obligation under rules 8-101(A) and 8-101(B) to pay funds or account to her. We rejected the contention, holding that the circumstances under which the attorney received the funds (receipt in trust of the proceeds of sale of the community property residence) created a duty to the wife as well as to the client husband. We accordingly upheld discipline on the basis of rules 8-101(A) and 8-101(B).

As noted, however, it is not necessary to a proper resolution of the case to determine whether or not Knapton was a "client" within the literal language of rule 8-101(B). In *Galardi* v. *State Bar, supra*, 43 Cal.3d 683, an attorney was disciplined for conduct in connection with two real estate transactions. The attorney contended no duty was owed because there was no attorney-client relationship between himself and the joint venturers. We rejected the contention, stating: "[I]t is well settled that an attorney may be disciplined for breach of a fiduciary duty owed to a nonclient. (*Worth* v. *State Bar* (1976) 17 Cal.3d 337, 341 [130 Cal.Rptr. 712, 551 P.2d 16].)" (*Id.* at p. 691.)

Here, petitioner not only owed a fiduciary duty to his clients to account carefully for their funds or property, but he also undertook on their behalf to act as a pledgeholder, if not the pledgee, of the stock.[11] The circumstances under which he took possession of the pledged stock, including full knowledge of the terms of the pledge agreement (i.e., that the stock was not to be sold until the case was concluded), created a duty to Knapton as well as to petitioner's clients.

Although petitioner cannot ordinarily be disciplined for a matter not charged, the notice to show cause advised petitioner that he was charged with violation of his oath and duties as an attorney (§§ 6068, subd. (a), 6103), acts of moral turpitude (§ 6106),[12] and incompetence (rules

---

[11] A pledge is a bailment for security. It is effected by delivery of possession of the pledged property, although title remains in the pledgor. (See *Sparks* v. *Caldwell* (1910) 157 Cal. 401 [108 P. 276].) A pledgee owes a fiduciary duty of care to preserve and protect the pledged property, and may be liable for conversion if the pledge is wrongfully sold or transferred without authority. (See 3 Witkin, Summary of Cal. Law (9th ed. 1987) Secured Transactions in Personal Property, § 6, pp. 426-427.)

[12] We do not decide whether petitioner's conduct necessarily involved moral turpitude within the meaning of section 6106. The hearing panel, which was in the best position to judge matters of credibility, specifically found petitioner did not intend to defraud Harris, Crist or Knapton, but was merely mistaken in his interpretation of the pledge agreement. The fact nevertheless remains that petitioner, acting in a position of trust and with knowledge of the terms of the agreement under which he held the stock, wrongfully sold the stock without authority and without notice to Harris, Crist or Knapton.

6-101(A)(2), 6-101(B)(1)),[13] in addition to violation of rule 8-101(A). He also had full notice of the specific conduct (sale of the stock without authority or notice) alleged to constitute the misconduct. (See *Sullins* v. *State Bar, supra*, 15 Cal.3d 609, 618 [suggesting that due process concerns may be met and no miscarriage of justice will occur where the attorney had sufficient notice to eliminate unfair surprise in preparation of the defense].) Substantial evidence supports an inference, at the very least, that petitioner's unlawful conduct violated his oath and duties as an attorney. (§§ 6068, subd. (a), 6103.) The finding as to count 2 is therefore sustained on that ground.

We find support for this conclusion in *Oster* v. *State Bar* (1935) 2 Cal.2d 625 [42 P.2d 627], in which we disciplined an attorney for misconduct similar to that here. There, the attorney accepted money from a nonclient to be used to secure a bail bond for a client. The receipt for the money noted that, if the bond were not secured, the funds were to be returned to the nonclient. The bond was not obtained, but the attorney returned only a portion of the funds. He retained the balance to pay for the client's accrued attorney fees, knowing that there was no separate agreement that the nonclient would be liable for the client's attorney fees. We there stated the attorney's conduct not only violated his oath and duties as an attorney, but he was also guilty of an act involving moral turpitude. (*Id.* at p. 627.)

### 3. Appropriate Discipline

 While we exercise our independent judgment in determining the discipline to be imposed (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]), we give great weight to the Review Department's disciplinary recommendation (*In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244]). Petitioner bears the burden of showing that the recommended discipline is erroneous or unlawful. (*In re Abbott* (1977) 19 Cal.3d 249, 253 [137 Cal.Rptr. 195, 561 P.2d 285].)

 An attorney's failure to communicate with clients and failure to use his best efforts and reasonable speed to accomplish the purpose for which he was employed are grounds for discipline.[14] (*Van Sloten* v. *State Bar, supra*, 48 Cal.3d 921, 932.) "Such a failure is a breach of the duty owed

---

[13] Rules 6-101(A)(2) and 6-101(B)(1) refer to the failure to perform services competently or the acceptance of employment when the attorney does not have sufficient time, resources or ability to handle a matter competently. Breach of a position of trust might be categorized as a form of incompetence, but matters of misappropriation are usually regarded under the rubric of rule 8-101 rather than rule 6-101.

[14] The Standards for Attorney Sanctions for Professional Misconduct provide a guide for the degree of discipline to be imposed. (See Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct [hereinafter referred to as Standards].)

by an attorney to each client." (*Matthew* v. *State Bar* (1989) 49 Cal.3d 784, 791 [263 Cal.Rptr. 660, 781 P.2d 952].)

 Standard 2.4(b) provides for reproval or suspension of a member for wilful failure to perform services (not amounting to a pattern of misconduct) or wilful failure to communicate with a client, the degree of discipline depending upon the extent of the misconduct and the degree of harm to the client.

With respect to the sale of the pledged stock, petitioner was required to hold the stock in trust until the litigation was completed and until any claims to the stock for payment of fees were resolved. Instead, he sold the stock before trial and without notice to anyone. (See *Garlow* v. *State Bar* (1988) 44 Cal.3d 689, 710 [244 Cal.Rptr. 452, 749 P.2d 1307].) Standard 2.6 provides that culpability for violation of sections 6068 and 6103 "shall result in disbarment or suspension depending on the gravity of the offense or the harm, if any, to the victim, with due regard to the purposes of imposing discipline . . . . "

Here, the Review Department has recommended six months' suspension, stayed, with one year's probation and only thirty days' actual suspension. The recommended discipline is within the guideline recommendations provided in the Standards.

Moreover, we are persuaded, upon our independent review of the record, that the recommended discipline is appropriate. Petitioner's misconduct was not insignificant. He incompetently failed to communicate with his clients in the Orth, Chinn and Licardo matter, and failed to act promptly, to the detriment of his clients' interests. His "explanation" for delay, written after he had been contacted by the State Bar, does not withstand scrutiny. In the Harris and Crist matter, petitioner abused his position of trust as a pledgeholder and sold the stock without notice, when he knew or should have known he was not authorized to do so. Taking due consideration of the findings in mitigation and the primary purpose of discipline, which is to protect the public, the courts, and the legal profession, a brief period of actual suspension is warranted. Petitioner has failed to sustain his burden of demonstrating that the recommended discipline is erroneous or unlawful.

### DISPOSITION

It is hereby ordered that John J. Hartford be suspended from the practice of law for six months, and that execution of the order be stayed and he be placed on probation for one year upon the conditions that he (1) be actually suspended from the practice of law for the first thirty days of the period of

probation, (2) comply during the period of probation with the provisions of the State Bar Act and the Rules of Professional Conduct, (3) shall report in writing to the Office of the Clerk of the State Bar Court at the times specified and as provided in the Review Department's resolution of January 29, 1988, (4) be referred to the Department of Probation of the State Bar Court for assignment of a probation monitor referee and cooperate with the probation monitor as provided in the Review Department's resolution of January 29, 1988, (5) shall maintain his current office address in the official records of the State Bar and shall promptly report all changes in membership information as required in section 6002.1, and (6) shall answer to the presiding official of the State Bar Court or to any probation monitor any inquiry relating to petitioner's compliance with probation, as provided in the resolution of January 29, 1988. It is further ordered that petitioner shall take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners within one year of the date of finality of this opinion.

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

**MOSK J.,** Concurring.—Although I agree in general with the court's opinion, I have some doubts about the discussion of California Rules of Court, former rule 8-101(A) [hereafter rule 8-101(A)] [now rule 4-100(A)]. Rule 8-101(A) provided that funds held for the benefit of a client must be held in an identifiable trust account and that the attorney's funds shall not be commingled with the funds in the trust account.

Petitioner's clients, Harris and Crist, arranged for a friend, Knapton, to deliver a stock certificate to petitioner as security for payment of their attorney fees and the litigation expenses. Harris, Crist and Knapton executed a written agreement among themselves, reciting that the attorney fees would be deducted from the total award to Harris and Crist "so as to preclude the necessity of ever cashing in the stock certificate and requiring Knapton to pay." Petitioner was not a party to the agreement, but did sign it as a witness.

At some point within the following year, however, petitioner sold the stock for $8,400 without notice to Harris, Crist, or Knapton. The hearing panel found the sale did not result in any undue gain to petitioner because Harris and Crist owed him over $10,000 in accrued attorney fees, that petitioner did not intend to defraud his clients or Knapton, and that petitioner ultimately entered into an agreement to return the stock to Knapton. The Review Department of the State Bar Court adopted the findings of the hearing panel and concluded that petitioner violated rule 8-101(A).

Petitioner disputes the finding of violation of rule 8-101(A), contending that the rule refers to the holding of a client's "funds," not "property," in trust, and is applicable to a "client," not a nonclient such as Knapton.

The opinion of the court holds the stock certificate was not "funds" that could be deposited in a bank trust account, even though it was held "for the benefit" of Harris and Crist. Accordingly, it is concluded, the finding of a violation of rule 8-101(A) cannot be sustained by the evidence, as the rule has no applicability to petitioner's holding of the stock certificate.

While the opinion may be technically correct, I believe that under rule 8-101(A), whether an attorney has a client's money or property in trust, the client should be notified before his property is sold and he should be given an opportunity to substitute payment if he desires to retain the property. While the court's discussion of rule 8-101(A) does not satisfy this concern, it does hold petitioner violated his oath and duties as an attorney by selling the stock without authority or notice.

For that reason I concur in the opinion.